Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO - WESTERN DIVISION

SANDRA GOODSITE,                )
                                )
        PLAINTIFF,              )
                                )
                                )JUDGE JEFFREY J. HELMICK
        vs.                     )CASE NO. 3:16-cv-02486
                                )
BOARD OF EDUCATION OF THE )
NORWALK CITY SCHOOL             )
DISTRICT,                       )
                                )
        DEFENDANT.             )


            -   -   -   -   -

        THE DEPOSITION OF JOHN A. LENDRUM
        WEDNESDAY, SEPTEMBER 27, 2017
            -   -   -   -   -


        The deposition of JOHN A. LENDRUM, called by
the Plaintiff for examination pursuant to the
Federal Rules of Civil Procedure, taken before me,
the undersigned, Sarah R. Drown, Notary Public
within and for the State of Ohio, taken at the
offices of McCarthy, Lebit, Crystal & Liffman Co.,
LPA, 1800 Midland Building, 101 West Prospect
Avenue, Cleveland, commencing at 10:03 a.m., the
day and date above set forth.

Deposition of John Lendrum, taken September 27, 2017

Page 16

```
 1        can't take it down if we're speaking at the
 2        same time.  So if that should happen, I may go
 3        back and repeat myself, just so we're sure that
 4        we have a clear record, okay?
 5    A   Okay.
 6            (Plaintiff's Exhibit 1 was marked.)
 7    Q   I am going to play a voicemail, and then I'm
 8        going to ask you some questions about it.  I
 9        have had my assistant transcribe the voicemail
10        and I'm handing you that now.  It's been marked
11        as Exhibit 1.
12               (Audio recording played.)
13    Q   The first question that I have is:  Was that
14        your voice on the voicemail?
15    A   Yes, it was.
16    Q   Okay.  Is that a voicemail that you left for
17        Sue Goodsite?
18    A   I left that message.  That's my voice.  I don't
19        know what I left it on, but it's definitely me
20        talking.
21    Q   Does Lendrum Exhibit 1 accurately transcribe
22        what you said on that voicemail?
23    A   Yes.
24    Q   Did you write out what you were going to say
25        before you said it?
```

CADY REPORTING SERVICES, INC. - 216.861.9270
www.cadyreporting.com

Deposition of John Lendrum, taken September 27, 2017

1    winning a designation as a School of Promise?

2  A  I remember when Pleasant got a School of

3    Promise designation, but I couldn't tell you

4    when it was.

5  Q  Was that something that was considered a

6    positive?

7         MR. HIRT:        Objection.

8     You can answer.

9  A  Yes.  Any time a school's recognized it's

10    positive.

11  Q  Was it kind of a big deal?

12         MR. HIRT:        Objection.

13     You can answer.

14  A  It's our school district.  That would be a big

15    deal, yes.

16  Q  It got media attention, do you recall that?

17  A  I recall some, yeah.  I don't -- the details or

18    what year, I can't exactly remember what

19    happened, but at the time there was

20    recognition, yes.

21  Q  Prior to that, were you aware of any other

22    school in Norwalk receiving that award?

23  A  Not a School of Promise.

24  Q  Has any school in Norwalk received that award

25    since then?

Deposition of John Lendrum, taken September 27, 2017

Page 50

```
 1        for the curriculum director position that was

 2        posted in 2006?

 3    A   That's what it appears to be, yes.

 4                    MR. HIRT:        I'm sorry to

 5        interrupt.  Could I get a copy, please?

 6                    MS. AHERN:        Oh, I'm sorry.

 7        I wrote on it.

 8                    MR. HIRT:        That's all

 9        right.

10                Thank you.  You want to -- okay.

11    Q   This is the position that Sue Goodsite was

12        awarded?

13    A   Yes.

14    Q   Are you familiar with a man named Bob Duncan?

15    A   Yes.

16    Q   Is he part of the Rotary Club?

17    A   No.

18    Q   Is he part of the Shakespeare Club?

19    A   No.

20    Q   He had been the high school principal at one

21        point?

22    A   Yes.

23    Q   Was it discovered at some point that he was not

24        conducting fire drills?

25    A   Yes.
```

Deposition of John Lendrum, taken September 27, 2017

Page 51

1    Q    Was that a problem?

2    A    It was a problem, yes.

3    Q    How long had it been since -- like what period

4         of time were fire drills not done?

5    A    I can't answer that without going back and

6         looking at, you know, some type of

7         documentation.

8    Q    Do you recall if it was a matter of years?

9    A    I don't believe it was that long, but I

10        couldn't tell you without looking at it.

11   Q    Was it also discovered that he was chewing

12        tobacco in the school?

13   A    Yes.  It was alleged that he was chewing

14        tobacco in school.

15   Q    Was that confirmed?

16   A    I believe that he was counseled on chewing

17        tobacco and that being inappropriate in the

18        school at the time, but, again, I would have to

19        go back and look at the documents.

20   Q    Was it discovered that he was having an

21        inappropriate relationship with another staff

22        member during the time that he was principal of

23        the high school?

24                  MR. HIRT:          Objection.

25             You can answer.

Deposition of John Lendrum, taken September 27, 2017

Page 75

```
 1        truth, hard work and honesty are not rewarded.

 2        I am willing to sit and clarify anything I have

 3        said contained within this letter.  I know some

 4        will treat me very harshly.  I am just tired

 5        and want all of the favoritism toward men and

 6        the 'network' of which I am obviously not a

 7        part to stop."

 8              Did I read that correctly?

 9   A    Yes.

10   Q    So you understood that -- refreshing your

11        recollection, you understood that she believed

12        that the motivation for this treatment was

13        because of her sex?

14                    MR. HIRT:        Objection.

15              You may answer.

16   A    That was her opinion in the letter.

17   Q    There's nothing inappropriate in terms of the

18        tone or what was communicated in this letter,

19        do you agree?

20                    MR. HIRT:        Objection.

21              You can answer.

22   A    No.

23   Q    You don't agree?

24   A    No.

25   Q    Okay.  What about the letter was inappropriate?
```

Deposition of John Lendrum, taken September 27, 2017

Page 99

1  Q   How about generally?

2  A   I just don't.  I don't recall.

3                  MS. AHERN:      Off the record,

4      please.

5                  (Recess taken.)

6  BY MS. AHERN:

7  Q   We're back on the record after a lunch break.

8          Mr. Lendrum, this morning we discussed

9      the notion generally of retire and rehire, and

10     I want to kind of put a finer point on that,

11     okay?

12         The term retire/rehire refers to a person

13     who retires for purposes of drawing from their

14     pension.  Is that your understanding?

15 A   Yes.

16 Q   It doesn't mean that they've retired from

17     working?

18 A   Not necessarily.

19 Q   Okay.  Some people retire and draw a pension

20     and stop working, is that your understanding?

21 A   It's a personal choice.

22 Q   Some people retire for purposes of drawing

23     their pension and continue to work?

24 A   Yes.

25 Q   Okay.  Am I correct in understanding that the

Page 100

```
 1         Norwalk City School District throughout your
 2         tenure has had a number of individuals who have
 3         retired for purposes of taking pension and then
 4         were rehired by the district into another
 5         position?  Or into the same position?
 6    A    Correct.
 7    Q    There's nothing legally that prevents a person
 8         from doing that, is that correct?
 9                   MR. HIRT:        Objection.
10            You can answer.
11    A    Not to my knowledge.
12    Q    There's no prohibition against it?
13    A    Not to my knowledge.
14    Q    Are you familiar with a person named Dave
15         Rehnborg?
16    A    Yes.
17    Q    Is he a person who was a retire/rehire?
18    A    Yes.
19    Q    He was a retire/rehire for -- he was in that
20         rehire situation for a number of years, is that
21         correct?
22                   MR. HIRT:        Objection.
23            You can answer.
24    A    It was more than one.  I'm not sure how many
25         years it was.
```

Deposition of John Lendrum, taken September 27, 2017

Page 101

1    Q    Is he still in that situation?

2    A    No.

3    Q    Okay.  How about a person named Bob Gullett,

4         are you familiar with him?

5    A    Yes.

6    Q    He was a high school math teacher?

7    A    Yes.

8    Q    Is it your recollection that he was a

9         retire/rehire for a number of years?

10   A    Yes.

11   Q    Do you know how many years?

12   A    I couldn't recall the exact number of years,

13        no.

14   Q    How about Paul Hiszem?  I may be saying that

15        wrong.  Are you familiar --

16   A    Close enough that I know who you're talking

17        about.

18   Q    Okay.  He's a school psychologist?

19   A    Yes.

20   Q    Okay.  Was he a person who was in a

21        retire/rehire situation?

22   A    Yes.

23   Q    Do you know how long that situation lasted?

24   A    I couldn't tell you the exact number of years.

25        I know it was more than one.

Deposition of John Lendrum, taken September 27, 2017

Page 102

1   Q   Sandusky is a community that's nearby Norwalk,
2       correct?
3   A   About 16 miles.  Yes.
4   Q   Do you have any understanding as to whether
5       their superintendent has been on a
6       retire/rehire?
7   A   I have no knowledge of Sandusky at all.
8   Q   All right.  How about EHOVE's superintendent?
9       And that's E-H-O-V-E.
10  A   I have nothing to do with that.  No knowledge
11      there either.
12  Q   You don't know?
13  A   No.
14  Q   All right.  So kind of marching through things
15      chronologically, is it your recollection that
16      Wayne Babcanec and Michael Gordon retired at
17      the same time?
18  A   Close to each other, yes.
19  Q   Is it your recollection that that happened in
20      about 2009?
21  A   I have to take your word on that one.  I can't
22      remember if it's 2009 or 2010.
23  Q   All right.  Let's look at a document that might
24      help.
25          (Plaintiff's Exhibit 20 was marked.)

Deposition of John Lendrum, taken September 27, 2017

Page 112

1    Q    Lendrum 26.

2              Do you recognize Lendrum 26 as an email

3         exchange between Steve Linder, Denny Doughty,

4         and the remainder of the Board?

5    A    Yes.

6    Q    Steve Linder's talking about some cost savings

7         that might be associated with retire/rehire as

8         it relates to teachers?

9    A    Yes.

10   Q    And then in the top, you respond, correct?

11   A    Yes.

12   Q    You say in the middle of that paragraph, "We

13        can argue the dollars but it appears we have a

14        fundamental difference on rehires as a matter

15        of policy."

16             And then you write, "While every

17        situation is different, when it makes sense for

18        the district to rehire we have to look at it.

19        In my opinion this could be financial or

20        because the person has a set of skills we

21        need."

22             Did I read that correctly?

23   A    Yes.

24   Q    Was that your opinion?

25   A    At the time I wrote it, that was my opinion,

Deposition of John Lendrum, taken September 27, 2017

Page 113

1     yes.

2   Q   Does that remain your opinion?

3   A   Yes.  While every situation is different, you

4       have to look at each case individually.

5           (Plaintiff's Exhibit 27 was marked.)

6   Q   Turning to Lendrum Exhibit 27.

7             Let me know when you're ready.

8   A   Okay.  I'm ready.

9   Q   Do you recognize Lendrum Exhibit 27 as an email

10      from Denny Doughty to the Board regarding the

11      assistant superintendent position in July of

12      2011?

13  A   Yes.

14  Q   So this is after Crooks had left?

15  A   Yes.

16  Q   He was advocating that as an option that the

17      curriculum director and assistant

18      superintendent position could be combined?

19  A   Yes.

20  Q   Did you agree that doing so was a potential

21      cost savings?

22  A   Yes.

23  Q   Steve Linder at the top writes, "I see a

24      potential savings of nearly $100,000."

25            Do you see that?

Deposition of John Lendrum, taken September 27, 2017

Page 130

1         Do you recognize Lendrum 35 as the job

2         description that applies to the superintendent

3         position?

4    A    Yes.

5    Q    Turning to where it says "Minimum

6         Qualifications" and "Physical Requirements."

7    A    Yes.

8    Q    Do you agree that Sue Goodsite meets those

9         minimum qualifications?

10   A    Yes.

11   Q    And physical requirements?

12   A    Yes.

13   Q    A decision was made in 2014 to utilize the

14        services of North Point Educational Service

15        Center to help fill the superintendent

16        position, is that correct?

17   A    Yes.

18   Q    So you were working with Doug Crooks again?

19   A    Yes.

20   Q    Do you have a good relationship with Doug

21        Crooks?

22   A    I think so.

23        (Plaintiff's Exhibit 36 was marked.)

24   Q    I'm handing you what's been marked as Lendrum

25        36.

Page 132

```
 1              (Plaintiff's Exhibit 37 was marked.)

 2   Q    I'm handing you what's been marked as Lendrum

 3        Exhibit 37.

 4              Do you recognize Lendrum Exhibit 37 as

 5        Sue's application?

 6   A    It appears to be so.

 7   Q    Did you review it at the time that you received

 8        it?

 9                    MR. HIRT:        Objection.

10              You can answer.

11   A    I reviewed the application that I was given at

12        the time, yes.

13   Q    Would you agree that Sue has impressive

14        educational credentials?

15                    MR. HIRT:        Objection.

16              You can answer.

17   Q    In terms of her own education and schooling.

18                    MR. HIRT:        Objection.

19              You can answer.

20   A    Yes.

21   Q    Do you agree that Sue had impressive community

22        leadership activities?

23                    MR. HIRT:        Objection.

24              You can answer.

25   A    And the definition of "impressive" is?
```

Deposition of John Lendrum, taken September 27, 2017

Page 133

1   Q   Well, did you find --

2   A   Sue had significant leadership activities

3       outside of the school.

4   Q   Did you review the performance evaluations that

5       Sue submitted in connection with her

6       application?

7   A   I reviewed everything that was in the

8       application that was given to me, yes.

9   Q   Would you agree that her performance

10      evaluations were favorable?

11  A   Yes.

12  Q   Do you agree that Sue had a long history of

13      employment to the Norwalk City School District?

14  A   Yes.

15  Q   Would you agree that Sue had significant ties

16      to the Norwalk community?

17  A   Yes.

18  Q   Did you understand that Sue really wanted the

19      job of superintendent?

20                  MR. HIRT:          Objection.

21          You can answer.

22  A   Yes.

23  Q   During the time that Sue was assistant

24      superintendent and curriculum director, are you

25      aware of any task that she did not complete to

Deposition of John Lendrum, taken September 27, 2017

Page 134

1    proficiency?

2              MR. HIRT:          Objection.

3         You can answer.

4    A  I don't know what the term "proficiency" means.

5       She performed her job well.

6    Q  Okay.  I'm just wondering if there was anything

7       in her performance of that role that you recall

8       as lacking.

9    A  No.

10   Q  So the process for this search was that the

11      applicants had to send their application

12      packets to North Point Educational Service

13      Center, is that correct?

14   A  Yes.

15   Q  According to the job posting that is Lendrum

16      36, the application deadline was June 27, 2014?

17   A  Yes.

18   Q  And then the North Point Educational Service

19      Center compiled all of the applications, is

20      that correct?

21   A  Yes.

22   Q  Did they send the applications to the school

23      board?

24   A  Yes.  They made a presentation.

25   Q  All right.  They came and they presented the

Deposition of John Lendrum, taken September 27, 2017

Page 139

1      Sue Carlson is likely going to take the EMIS

2      job at Perkins.  An $11,000 increase.  That

3      will be another hard hole to fill.  Scott Ford

4      saw Denny and said he would be at the meeting

5      Tuesday to encourage the Board to hire Sue as

6      Superintendent.  See you Tuesday evening if not

7      before."

8           Did I read that correctly?

9  A   Yes.

10 Q   Would you agree that the resignation of Sue

11     Carlson is business pertaining to the Board?

12              MR. HIRT:       Objection.

13          You can answer.

14 A   At that point it was information that I had,

15     but it's not an action.

16 Q   It's not a discussion about matters that affect

17     the Board?

18              MR. HIRT:       Objection.

19          You can answer.

20 A   I don't consider it that.

21 Q   Who's Scott Ford?

22 A   Scott Ford is a community member.

23 Q   Does he have any connection to the schools?

24 A   A former teacher.

25 Q   Did he come to the meeting to advocate the

Deposition of John Lendrum, taken September 27, 2017

Page 140

1      hiring of Sue as superintendent?

2  A   He came to a meeting and advocated for Sue to

3      be hired.  I don't remember whether it was 2014

4      or 2015.

5          (Plaintiff's Exhibit 40 was marked.)

6  Q   Lendrum 40.

7          Does Lendrum 40 refresh your

8      recollection --

9  A   Yes.

10 Q   -- that it was 2014 when Scott Ford appeared at

11     the Board meeting to advocate hiring Sue?

12 A   Yes.

13 Q   Did you have any reason to doubt anything that

14     Scott Ford was saying at that meeting?

15               MR. HIRT:        Objection.

16         You can answer.

17 A   No.

18 Q   Was there any other candidate that got public

19     support during the 2014 search?

20               MR. HIRT:        Objection.

21         You can answer.

22 A   I don't believe there was anybody else that had

23     public participation support for the position.

24 Q   By June 14, is it fair to say that you knew

25     that Sue Goodsite would be applying for the

Deposition of John Lendrum, taken September 27, 2017

Page 144

1   Q   He had been sued?

2   A   There was some pending litigation that he was

3       related to in his time as a superintendent, and

4       the Board did not want to go down that road.

5   Q   My question is:  Was he the person who brought

6       the litigation or --

7   A   No.

8   Q   Okay.  The litigation was brought against him?

9   A   My recollection is that it was

10      misconduct-related.

11  Q   Looking back at Lendrum Exhibit 38, the

12      superintendent search log, is it fair to say

13      that Will Folger did not go through the

14      application process in the manner that these

15      applicants who are on 38 did?

16                  MR. HIRT:          Objection.

17          You can answer.

18  A   Will did not go through this process, no.

19          (Plaintiff's Exhibit 43 was marked.)

20  Q   I'm handing you what's been marked as Lendrum

21      Exhibit 43.

22          Do you recognize Lendrum Exhibit 43 as a

23      newspaper article --

24  A   Yes.

25  Q   -- from July 13, 2014?

Deposition of John Lendrum, taken September 27, 2017

Page 162

1   A   Yes.

2   Q   Was it true that Patrick Colucci did not want

3       you to call his current employer?

4   A   He had asked that his current employer -- my

5       recollection is he asked his current employer

6       not be called unless he was on a -- what's the

7       word I'm looking for.  A finalist.

8   Q   Okay.  Did you abide by that request?

9   A   I believe so.

10  Q   So turning back to Lendrum 49, is it your

11      recollection that your first interview with Sue

12      Goodsite did occur on July 15?

13  A   I think that's probably correct.  Without

14      seeing the supporting document, that sounds

15      right.

16  Q   Do you know if you took notes of that meeting?

17  A   Whatever notes I had from that, I provided.

18  Q   That's not my question.

19          My question is:  Did you take notes

20      during Sue Goodsite's interview?

21  A   I'm sure that I did.

22  Q   Were the notes on a notepad or a notebook or

23      loose pieces of paper?  How were they kept?

24  A   Probably a combination of all three.

25          (Plaintiff's Exhibit 56 was marked.)

Deposition of John Lendrum, taken September 27, 2017

Page 167

1   A   No.

2   Q   "36 years here" is the next line?

3           Is that right?

4   A   Yes.

5   Q   She's referring to her time in Norwalk?

6   A   Yes.

7   Q   Next line, it says, "Loyal"?

8   A   Yes.

9   Q   And then it says, "unless writing letters"?

10  A   Yes.

11  Q   Is that a reference to the 2008 letter?

12  A   I don't know that.

13  Q   Do you know what that refers to?

14  A   No.

15  Q   Are you aware of any other letter that Sue

16      Goodsite sent you?

17  A   Over the course of the time I'm on the Board,

18      there was quite a bit of correspondence from

19      Sue, but I'm not -- I don't know if that

20      relates to a specific one or not.

21  Q   It says, "Impressed with district loyalty"?

22  A   Yes.

23  Q   Was that your impression?

24  A   I don't know what the thought was when I wrote

25      that.

Deposition of John Lendrum, taken September 27, 2017

1    Q    It says, "2008 threatened lawsuit.  Coached on

2         answer"?

3    A    Yes.

4    Q    Was she asked about threatening a lawsuit in

5         2008?

6    A    My recollection is that it was brought up in

7         the interview.

8    Q    Who brought it up?

9    A    I don't remember.

10   Q    What about her --

11   A    I remember discussing it.

12   Q    What was discussed?

13   A    The 2008 document.

14   Q    The April letter --

15   A    Yes.

16   Q    -- that we looked at this morning?

17   A    And my recollection is that she addressed that

18        in her interview.

19   Q    Why was that relevant to your hiring in 2014?

20             MR. HIRT:         Objection.

21         You can answer.

22   A    My recollection is that she thought it was

23        important that that be explained.  I don't

24        believe the Board brought it up.

25   Q    Well, then how would she be coached on an

Deposition of John Lendrum, taken September 27, 2017

Page 179

1  Q  Do you recall why he said he would not

2      recommend Sue?

3  A  He told me that he felt she was just not right

4      for the position of superintendent.

5  Q  Did he elaborate?

6  A  He told me that he thought she was a good

7      curriculum director but that she didn't have

8      some of the skill sets needed to do the other

9      things a superintendent had to do.

10  Q  Did he say which skill sets she lacked?

11  A  I think it was related to interpersonal.

12  Q  Do you definitely recall that?

13  A  I could not give you a list of five things that

14      he gave me during the conversation.

15  Q  Could you give me a list of any of the things?

16  A  His recommendation was that she should not be

17      hired as superintendent.

18  Q  Did it weigh into your -- the way you evaluated

19      that recommendation that Sue had accused him of

20      being discriminatory towards her?

21             MR. HIRT:        Objection.

22      You can answer.

23  A  I don't believe so, because we didn't talk

24      about that.  It was just his opinion.

25  Q  Anything more specific that you recall about

Deposition of John Lendrum, taken September 27, 2017

Page 185

1           the content of his conversation, with Doughty.

2    A      Denny and I had a conversation.  He did not

3           believe that Sue was prepared to be

4           superintendent, and some of the reasons he

5           cited were that she was very good in her

6           current job position as curriculum director and

7           doing what she was doing, she did a nice job of

8           that, but he doubted that she had the

9           experience or temperament to deal with some of

10          the hard issues that a superintendent was

11          required to do, which included, you know,

12          negotiations, financial, dealing with some of

13          the people issues.  He just didn't think that

14          she was ready for that.  It was not a comment

15          on her current job performance or what she was

16          doing, that was just his opinion.

17   Q      Did he use the word -- did he say "She's not

18          qualified" or did he say "She didn't have the

19          experience and temperament"?

20   A      I don't recall him using the phrase "not

21          qualified."

22   Q      Okay.

23   A      But in the course of our conversation, it was

24          clear to me that he would not recommend her for

25          the superintendent's position.

Deposition of John Lendrum, taken September 27, 2017

Page 186

1   Q   For the reasons that you've already cited?

2   A   Yes.

3   Q   Were there any other reasons that he cited?

4   A   I don't recall there being anything else in the

5       conversation.

6           (Plaintiff's Exhibit 60 was marked.)

7   Q   Lendrum 60.

8           You then asked him to share his comments

9       with the rest of the Board?

10  A   Yes.

11  Q   Is there anybody else that you talked to with

12      respect to whether they would recommend Sue

13      Goodsite for the position of superintendent?

14  A   Virginia Poling.

15  Q   Okay.  You talked to her personally?

16  A   Yes.

17  Q   Where?

18  A   I spoke to her at a Rotary Club meeting.

19  Q   Okay.  Virginia Poling had never worked with

20      Sue while she was in Central Office, right?

21  A   Virginia was superintendent when Sue was

22      principal at Pleasant Street.  There was some

23      time lag there.  I don't think Sue had yet.  We

24      went through that earlier.  I can't remember

25      the date.  I don't know if Sue -- I don't

Deposition of John Lendrum, taken September 27, 2017

Page 187

```
 1        believe Sue had gone from Pleasant Street to
 2        the Central Office before Virginia retired.
 3    Q   Okay.  So --
 4    A   So it would have been as a building
 5        administrator.
 6    Q   Virginia's most recent experience with Sue
 7        would have been in 2002, is that your
 8        recollection?
 9                    MR. HIRT:          Objection.
10            You can answer.
11    A   Virginia retired in 2002, yes.
12    Q   Do you know whether she had any professional
13        interaction with Sue in the 12 years between
14        her retirement and this application?
15    A   I wouldn't have any way of knowing whether she
16        talked to Sue or not.
17    Q   How is it that you came to talk to Virginia
18        Poling about Sue's candidacy?  You saw her at
19        the meeting and you asked?
20    A   I did not ask.  She told me.
21    Q   Okay.  What did she tell you?
22    A   She told me that she did not think that Sue
23        would make a good superintendent.
24    Q   Did she say why?
25    A   She said that she thought she did not deal with
```

Deposition of John Lendrum, taken September 27, 2017

1      people very well and that she would not be

2      someone that would be able to handle all of the

3      aspects of the district, that she was very good

4      at doing some things, but that she would not be

5      a person that could do the entire job and what

6      was required of it.

7  Q  Was there anybody else there when you had this

8      conversation?

9  A  There were other people in the room, but I

10     don't know if anybody was part of the

11     conversation.

12  Q  So you were in a big open room having this

13     conversation with her?

14  A  We were sitting at lunch.

15  Q  Okay.  With all of the other Rotary Club

16     members?

17  A  Table conversation.

18  Q  Anything else that Virginia Poling said

19     regarding Sue Goodsite's candidacy?

20  A  No.

21  Q  Do you remember when this conversation

22     occurred?

23  A  I cannot give you an exact date, but it had to

24     be at some point when this -- after the

25     candidates were announced.

Deposition of John Lendrum, taken September 27, 2017

Page 189

1  Q  Is there anybody else that you talked to about

2     Sue's candidacy?

3  A  Not specifically about her candidacy, no.

4  Q  Okay.  About anything else relating to Sue?

5  A  No.

6  Q  And then at some point you had the applicants

7     back for second interviews, is that correct?

8  A  Yes.

9  Q  You had all three applicants back for second

10    interviews?

11 A  That's my recollection, yes.

12    (Plaintiff's Exhibit 61 was marked.)

13 Q  Lendrum Exhibit 61.

14       This is an email between you and Doug

15    Crooks regarding second interviews?

16 A  Yes.

17 Q  At the bottom, it indicates that they were set

18    for interviews on July 22, Jim and Patrick

19    were?

20 A  Yes.

21 Q  He informed them of the topics that you wanted

22    to discuss?

23 A  Yes.

24 Q  So they were aware of some of the questions

25    that they would be asked before they were asked

Deposition of John Lendrum, taken September 27, 2017

Page 215

1       example, "How do you bring the unwilling or

2       incapable along?"  That's a pretty consistent

3       question I was asking.  So some of this is

4       probably from the 7/22 interview.

5   Q   Who's Todd Porcello?

6   A   I don't know if it was a reference.  I

7       jotted -- that's something that might be after

8       the fact.  And I think the scribble at the

9       bottom might be from after the fact, but I'm --

10      I can't say with any certainty what this is

11      saying.

12  Q   Do you recall calling Sue Goodsite on July 26,

13      2014, which was a Saturday, and leaving a

14      voicemail message?

15  A   Sorry.  I --

16  Q   Here.  You don't have to take my word for it.

17      That's the day of the week.

18  A   I'm just trying to get the days of the week

19      straight.  I called her on a Saturday after

20      Board -- yes.  I called her on Saturday.  I did

21      not get her.

22  Q   What are you looking at on your phone, out of

23      curiosity?

24  A   The date on the calendar to make sure that was

25      a Saturday.

Deposition of John Lendrum, taken September 27, 2017

Page 216

1  Q  Okay.  And you left a voicemail message?

2  A  Yes.

3  Q  Okay.  And then she returned your call on

4     Sunday, July 27?

5  A  Yes.

6  Q  Do you have notes from that conversation?

7  A  I do not.  There were no notes taken of that

8     conversation.

9  Q  What was the purpose of that call?

10 A  That call was to tell her that it appeared that

11    we were going to some type of interim situation

12    because we did not have a clear superintendent

13    choice.

14 Q  So this was after Millet had declined?

15 A  Yes.  That was on Saturday morning in a

16    conversation that Ralph Ritzenthaler and I had

17    with him at the Board office.  He declined.

18 Q  So Millet came to the Board office?

19 A  No.

20 Q  Okay.

21 A  The Board met on Saturday and Ralph and I were

22    to get there early, talk to Millet and go over

23    an offer and iron out the details.  And our

24    intent was to try and have that discussion with

25    him on Saturday and arrive at a Board consensus

Deposition of John Lendrum, taken September 27, 2017

Page 220

1       morning, I had not made a decision.

2    Q   What happened next?

3    A   The Board decided we needed to check out the

4        interim.  We had a discussion about Sue.  We

5        had a discussion about Will Folger, which at

6        that point nobody had talked to, nobody had

7        seen face-to-face, nobody knew anything.  We

8        decided that we needed to interview him and

9        talk to him.

10            I was told to call Sue, which we tried to

11       do before the Board left.  The message that I

12       left her on Saturday was from the Board office.

13       That was with the Board members there.

14            She called me back on Sunday morning and

15       the question was the same that we asked

16       earlier:  Would you accept an interim, if so,

17       you know, salary, one-year contract, the whole

18       nine yards.  And that's what I was asked to

19       follow up.

20   Q   Did you mention to her that Will Folger was

21       being considered as an assistant

22       superintendent?

23   A   I told her that we were going to interview Will

24       Folger.

25   Q   Did you understand that -- did you tell her

Page 221

1    that you were interviewing Will Folger for an
2    assistant superintendent position?
3  A  I don't recall my exact wording, but I told her
4    that at that time no decision had been made by
5    the Board.  I asked her would she be willing to
6    serve as an interim and that Will Folger was
7    going to be interviewed.
8  Q  Did you tell him what position he was being
9    interviewed for?
10 A  I don't recall when I talked to Will if he was
11   told specifically what he was being interviewed
12   for.
13 Q  Did you have another call with Sue the
14   following day?
15 A  I had a call with Sue on Sunday.
16 Q  Okay.  What about Monday?  Do you recall Sue
17   called you on Monday?
18 A  The calls run together.  I remember Sue -- I
19   don't remember if it was Sunday or Monday that
20   Sue and I spoke again.  She asked me if she
21   needed to come back, if she needed to be
22   present for the Board meeting.  She was on
23   vacation in southern Ohio.  She asked me if she
24   needed to be present for the Board meeting
25   where Will was coming in to talk to the Board.

Deposition of John Lendrum, taken September 27, 2017

Page 222

```
 1        Did she need to come back for that, was there a
 2        reason for her to come back for that.  My
 3        recollection is I told her he was coming for an
 4        interview and there would not be any action
 5        taken at that meeting and that she did not need
 6        to come back from vacation to do that.
 7   Q    Do you recall when you talked to her on the
 8        Sunday that you were on the golf course?
 9   A    Yes.
10   Q    Do you recall telling her that she should
11        follow up the next day because you needed to
12        review your notes that you didn't have with you
13        on the golf course?
14   A    I remember telling her that I was on the golf
15        course and that she should call me on Monday
16        when she had time.
17   Q    Do you recall telling her that you wanted to
18        have your notes in front of you to make sure
19        that you hadn't missed anything?
20   A    I don't remember that specifically.
21   Q    Do you recall telling Sue that as interim
22        superintendent, all decisions regarding the
23        district would end -- if she got the position,
24        would end on her desk?
25   A    Say what now?
```

Deposition of John Lendrum, taken September 27, 2017

Page 223

1   Q   Do you recall telling Sue that all final

2       decisions regarding the district would end at

3       her desk?

4                   MR. HIRT:        Objection.

5       That's a different question than the one you

6       just asked.

7                   MS. AHERN:        It is a

8       different question.

9   A   If she got which job now?

10  Q   Let me ask you this:  Do you recall using words

11      to the effect, regardless of the position, "All

12      decisions regarding the district will end at

13      your desk"?

14                  MR. HIRT:        Objection.

15  A   I don't recall that language.  I'm not sure

16      what context you're talking about or why.

17  Q   Do you --

18  A   I'm not sure where you're going with that

19      question.

20  Q   Do you recall telling Sue that there would be

21      no need for her to attend the Board meeting

22      because it would be a five-minute meeting, or

23      words to that effect?

24  A   What I recall telling her was the meeting where

25      Will Folger was coming in, that there would be

Page 224

1    no action taken and that there wouldn't be any

2    other business done at the meeting other than

3    him coming in, so there would be no reason for

4    her to come back.  There were not going to be

5    any other business conducted other than Will

6    Folger coming in related to her hire.

7         (Plaintiff's Exhibit 74 was marked.)

8  Q  Lendrum 74.

9         Do you recognize Lendrum 74 as an email

10   exchange between you and Doug Crooks?

11 A  Yes.

12 Q  Dated July 28, 2014?

13 A  Yes.

14 Q  So that was a Monday?

15 A  Yes.

16 Q  He's saying, "What's the word on the

17   superintendent?"

18 A  Yes.

19 Q  You respond, "I will call you too lengthy to

20   write."

21 A  Yes.

22 Q  Do you recall what you talked about with him?

23 A  He knew we were meeting Saturday, and I think

24   he fully expected we would have had a decision

25   on Saturday.  And that's what he wanted to

Deposition of John Lendrum, taken September 27, 2017

Page 225

```
 1        know, was there a decision.  And I just told
 2        him it would be easier to call you than it is
 3        to write it to relate to him what had happened.
 4           (Plaintiff's Exhibit 75 was marked.)
 5   Q    I handed you what's been marked as Lendrum 75.
 6             Are those your notes?
 7   A    Yes.
 8   Q    Are these your notes of your interview with
 9        Will Folger on July 28?
10   A    Again, there may be some things that are
11        written on here after the 28th.
12   Q    Okay.  It says, "Retire rehire double dip."
13   A    Yes.
14   Q    Will Folger was in a retire/rehire situation?
15             MR. HIRT:          Objection.
16           You can answer.
17   A    Yes.  He had retired.
18   Q    Is that what that refers to, that note?
19   A    Yes.
20   Q    It says, "JD current."
21             Was that the question?
22   A    He has a juris doctor.
23   Q    But it was not active?
24   A    It was not active, right.  He had a degree in
25        education law and he was not currently
```

Deposition of John Lendrum, taken September 27, 2017

Page 226

1       practicing.

2    Q    Do you know if he ever practiced?

3    A    I believe he did for a brief while, but I

4         couldn't swear to that.

5    Q    The next line says, "Current law, education

6         side."

7              Do you know what that means?

8    A    I think it was in relation to his degree.  I'm

9         not sure what that ...

10   Q    What does the next line say?

11   A    "Interim - easier for change and to clean up."

12   Q    What does the next line say?

13   A    "Work for five of us, not just one."

14   Q    Was that his response to the question about

15        whether he would be okay with a split Board?

16   A    Yes.

17   Q    Do you recall --

18   A    I believe so.

19   Q    Go ahead.

20   A    Yes, I believe so.

21   Q    Do you recall Will Folger being asked about

22        whether he would serve in the role as assistant

23        superintendent if Sue were named interim

24        superintendent?

25   A    I believe he was asked that before this

Deposition of John Lendrum, taken September 27, 2017

Page 227

1        meeting.

2   Q    And he was agreeable to that?

3   A    He was agreeable to serve in whatever capacity

4        he was needed was my understanding.

5   Q    Do you recall he said "If I work as assistant

6        superintendent, I want the salary that Sue

7        Goodsite has" and "If I work as superintendent,

8        I want the salary that Denny had"?

9   A    I don't recall that specifically, no.

10  Q    It says, "Denny at 110."

11  A    Yes.

12  Q    That was Denny's salary?

13  A    Yes.

14  Q    And then "127 pickup pickup - 133, 134."

15  A    Yes.

16  Q    What's that?

17  A    I think that would have been if there were

18       pickup, what those dollar amounts would come

19       out to, his total compensation.

20  Q    Okay.

21  A    But I'm not sure where that was scribbled from

22       or who did the math or whether that was done at

23       the time or done later.

24  Q    What does the next line say?

25  A    "Selling community" and "assistant super left."

Deposition of John Lendrum, taken September 27, 2017

Page 228

1          And I'm not sure what context that was in.

2     Q    That's not a reference to Sue Goodsite?

3     A    No.  No.

4     Q    That's him talking about a previous experience?

5     A    I think it was a previous experience or

6          something.  That doesn't relate to Sue.

7     Q    It says, "Adjourn 2140."

8               "Out 2150."

9               Is that military time for when the

10         meeting ended?

11    A    Yes.

12    Q    And then it says, "Call Sue."

13              But you don't -- do you know whether the

14         "Call Sue was" written at that time?

15    A    I do not know if it was written at that time or

16         not.

17    Q    Do you recall that there was a reporter at the

18         meeting when Will Folger was?

19    A    I think Cary Ashby was there, but I couldn't

20         swear to that.

21         (Plaintiff's Exhibit 76 was marked.)

22    Q    Lendrum 76.

23              Do you recognize Lendrum 76 as a --

24    A    Featured product of the month?

25    Q    No.

Deposition of John Lendrum, taken September 27, 2017

Page 242

1   A   Yes.

2   Q   It says, "John

3           Excellent work on your selection of the

4       superintendent.  Dr. Folger will do a very good

5       job for the" residents, it's a grammatical

6       mistake, but "the residents of Norwalk."

7   A   Yes.

8   Q   What does your reply to him mean?

9   A   I think it's misspelled.  I think I say "I'll

10      call you.  I'd like to talk through this one."

11  Q   At that point what was there to talk about?

12  A   At that point I think I was trying to close the

13      loop on the process and what would be done.

14      And, you know, there had been a selection made,

15      so I'm not sure that there was anything else to

16      talk about, but obviously I said I'd call him.

17          (Plaintiff's Exhibit 81 was marked.)

18  Q   Lendrum 81.

19          Do you recognize Lendrum 81 as an email

20      that was forwarded to you from Rob Ludwig?

21  A   Yes.

22  Q   Melissa James was the president of the Chamber

23      of Commerce?

24  A   Yes.

25  Q   Is she someone that you know in the community?

Deposition of John Lendrum, taken September 27, 2017

Page 248

1      review, cut and paste in.

2   Q   Was it finalized?

3   A   I don't believe this was ever finalized.

4   Q   Do you know why?

5   A   I suspect that it was just overcome by events.

6      There were copies of it kicking around and to

7      my knowledge, it never became final.

8   Q   So was it ever given to Folger?

9   A   He may have seen a copy of it.

10  Q   Did you give him a copy of it?

11  A   I may have.

12  Q   Do you recall as you sit here today?

13  A   Can I say for sure that I gave him a copy of

14     it, no.

15        (Plaintiff's Exhibit 84 was marked.)

16  Q   Lendrum 84.

17        Do you recognize this as Will Folger's

18     employment application?

19  A   Yes.

20  Q   Is this the first time that he made application

21     to the district?

22  A   Yes.

23  Q   He did not have to go through North Point, is

24     that correct?

25  A   He did not go through North Point, no.

Deposition of John Lendrum, taken September 27, 2017

Page 263

```
 1        role as an assistant superintendent/curriculum
 2        director?
 3   A    Yes.
 4   Q    Did she do a good job during that school year?
 5   A    She did the things that she needed to do, you
 6        know, to perform her job.  She kept things
 7        moving.  She attended meetings.
 8             You know, I don't have anything that --
 9        in the course of Dr. Folger's time, she had
10        some constraints because of her contract days.
11        So, you know, it wasn't that she was there
12        every day, but that was understood when she was
13        hired.  And the length of the contract she was
14        on.
15             So, you know, she was creative about how
16        she had to cover the days she needed to cover
17        in order to meet her objectives.  I don't --
18   Q    So you don't have any criticisms in the way she
19        performed in that year?
20   A    No.  I don't have something specific in that
21        year, no.
22   Q    Was there any intention of employing Sue beyond
23        that year?
24             MR. HIRT:         Objection.
25             You can answer.
```

Deposition of John Lendrum, taken September 27, 2017

Page 264

```
 1   A   I don't recall any discussion about employing
 2       her beyond that year.  She was in the second
 3       year of retire/rehire, and I don't recall any
 4       discussion at the time that Will was hired
 5       about a contract longer than a year.
 6   Q   My question wasn't about whether there was
 7       discussion.  My question is whether there was
 8       any intention of keeping her beyond that year.
 9   A   I don't recall any intention or discussion on
10       hiring her beyond that year at the time she was
11       hired.
12   Q   You understood, though, that Sue wanted to
13       continue on with the district, is that correct?
14               MR. HIRT:         Objection.
15          You can answer.
16   A   She had told us that she wanted to continue on
17       in the district.
18   Q   And then she applied for the 2015
19       superintendent job?
20   A   Yes, she did.
21   Q   That was an indication she wanted to continue
22       on with the district?
23   A   Yes.
24   Q   Do you think that when she applied for the job
25       in 2015 she really wanted the job?
```

Deposition of John Lendrum, taken September 27, 2017

Page 265

1           MR. HIRT:          Objection.

2           You can answer.

3    A   I don't think she would have applied if she

4        didn't want it.

5    Q   In 2015 you decided to use the Ohio State --

6    A   Ohio School Boards Association.

7    Q   Ohio School Boards Association?

8    A   Yes.

9    Q   You worked with a woman named Cheryl Ryan who

10       coordinated that search?

11   A   Yes.

12   Q   Do you recall that Cheryl Ryan and the Ohio

13       School Boards Association put together a time

14       frame for the hiring process?

15   A   Yes.

16       (Plaintiff's Exhibit 90 was marked.)

17   Q   I'm handing you what's been marked as Lendrum

18       90.

19           Do you recognize that as the time frame

20       that was developed?

21   A   I believe it has to be.  I don't recall it

22       specifically, but there was a time length

23       involved.  I don't know if we stuck to this

24       when it was final said and done, but this was

25       the plan.

Deposition of John Lendrum, taken September 27, 2017

Page 277

1      presented with this.  I remember her going

2      through each individual candidate, but I don't

3      remember what she had for numerical ranking or

4      order of each candidate.

5   Q   Okay.

6   A   If you have that, I would be happy to look at

7      it.

8          (Plaintiff's Exhibit 98 was marked.)

9   Q   Lendrum 98.

10  A   I bet you just so happen to have it.

11  Q   Have you seen Lendrum 98 previously?

12  A   This looks more like it.

13  Q   Lendrum 98 is a consolidated list of the

14     applicants, is that correct?

15  A   Yes.

16               MR. HIRT:          Objection.

17          You can answer.

18  Q   Are those the candidates that she recommended

19     be interviewed?

20  A   This was who they felt fit what we needed, that

21     we should recommend -- or that we should

22     interview, yes.

23  Q   Now looking at that where it says under "Jay

24     Arbaugh," for instance, it says, "Scored 1, 1-,

25     1-."

Page 278

1           Do you see that?

2    A    Yes.

3    Q    Does that refresh your recollection as to

4         whether she had numerical rankings for at least

5         some of the candidates?

6                   MR. HIRT:        I'm going to

7         object.

8                   You can answer.

9    A    I don't remember.

10   Q    Is it fair to say that the numerical rankings

11        that OSBA assigned, if they assigned them, did

12        not play much of a role in your decision

13        making?

14                  MR. HIRT:        Objection.

15        You've not established that they did a

16        numerical ranking.

17                  MS. AHERN:       I said "if."

18   A    OSBA went through and screened it.  They gave

19        us these numbers and then the Board got the

20        packet.  We listened to her, and then the Board

21        made a determination of who they were going to

22        interview.  I'm not sure that I have a context

23        of what the numbers meant.

24   Q    Under "George Fisk," among other things, it

25        says, "Mid career."

Deposition of John Lendrum, taken September 27, 2017

Page 282

1          interviewees appears?

2     A    Yes.

3     Q    Does that refresh your recollection as to how

4          many people were selected for interviews?

5     A    Yes.

6     Q    The second page, it says, "Following that

7          meeting, board president John Lendrum shared

8          with the Reflector what he and the rest of the

9          board were looking for in the applicants."

10              Did I read that correctly?

11    A    Yes.

12    Q    It says, "The board wanted longevity before

13         retirement."

14              Is that an accurate quote?

15    A    Yes.

16    Q    The next page, it says in quotes, "'One of the

17         things that came out of the community meetings

18         was some longevity ... not someone who would be

19         here two years and be out,' Lendrum said."

20    A    Yes.

21    Q    Is that an accurate quote?

22    A    Yes.

23    Q    Then it goes on to say -- skip a paragraph.

24         "'We're looking at someone mid-career,' Lendrum

25         said."

Deposition of John Lendrum, taken September 27, 2017

Page 287

1   A   Yes.

2   Q   This was after George Fisk had started?

3   A   Yes.

4   Q   And then it says, "The Assistant Super is our

5       next challenge as we need to get something in

6       place for the fall."

7   A   Yes.

8   Q   Did you understand on June 5, 2015 that Sue

9       Goodsite would not be remaining in that role?

10  A   No.

11  Q   Then what did you mean by "we need to get

12      something in place for fall"?

13  A   Because we didn't have anybody.

14  Q   Okay.  What about Sue?

15  A   Well, at that point she's on a one-year

16      contract.

17  Q   She could have been renewed, though, right?

18  A   She could have --

19              MR. HIRT:          Objection.

20          You can answer.

21  A   Yes, she could have been, but at that point she

22      wasn't yet.

23  Q   Did the Board ever ask her if she would

24      consider staying?

25  A   She made it known on numerous points in time

Deposition of John Lendrum, taken September 27, 2017

Page 288

1    that she would stay.

2  Q  That she would stay?

3  A  Yes, that she would stay.  The Board was aware

4    that she would stay.

5  Q  And the Board chose to not have her stay?

6              MR. HIRT:        Objection.

7         You can answer.

8  A  The Board did not offer a contract for her to

9    stay, no.

10 Q  Why?

11             MR. HIRT:        Objection.

12        You can answer.

13 A  The superintendent, Mr. Fisk, did not recommend

14   that.  He recommended changing from an

15   assistant superintendent to a director of

16   operations.  Reorganized where it traditionally

17   would have been the functions and duties within

18   the superintendent's office, the way things had

19   been done in the past, and he had a plan that

20   he thought was a better way to operate the

21   district.  And the Board supported that.

22 Q  Was Sue considered for the director of

23   operations position?

24 A  I was not part of discussion where we had that

25   discussion, no.

Deposition of John Lendrum, taken September 27, 2017

Page 290

```
 1              Do you recognize Lendrum 106 as a letter
 2        that you received from Sue Goodsite?
 3    A   Yes.
 4    Q   You and the rest of the Board --
 5    A   Yes.
 6    Q   -- and Mr. Fisk?
 7    A   Uh-huh.
 8    Q   Did you respond to this letter?
 9    A   I don't recall if I responded to it or not.
10    Q   Do you know if anybody did?
11    A   I have no knowledge if anybody else did or not.
12    Q   Mr. Fisk applied to leave the district for
13        another position shortly after he accepted the
14        position with Norwalk?
15    A   Yes.
16    Q   He didn't get that job?
17    A   He withdrew.
18    Q   He withdrew or he wasn't selected?
19    A   My understanding was that he withdrew.
20    Q   Huh.  My understanding was that he wasn't
21        selected.
22              Where is your understanding from?
23    A   I was never told that there was a selection
24        process and he was not selected.
25    Q   If the documents from -- well, you understood
```

Deposition of John Lendrum, taken September 27, 2017

Page 291

```
 1        that the district he applied to was North

 2        Canton?

 3   A    Yes.

 4   Q    If the documents from North Canton show that he

 5        was not selected, would that surprise you?

 6   A    I've never seen North Canton documents so ...

 7   Q    I'm just trying to understand where your

 8        understanding that he withdrew came from.

 9   A    I don't recall having the conversation with him

10        about nonselection.  Or maybe somebody else on

11        the Board did.

12   Q    Do you know where you got the impression that

13        he withdrew?

14   A    I believe it was in a Board meeting, but I

15        can't -- I don't remember that for sure.

16   Q    After he applied for that position, he was

17        given a $27,000 pay increase, is that correct?

18   A    He had an agreement in the second year of his

19        contract, I don't know what the dollar figures

20        were, but his contract that he was hired under.

21   Q    Did it concern you that he broke contract with

22        East Palestine?

23                   MR. HIRT:        Objection.

24            You can answer.

25   A    That was discussed during the interview
```

Deposition of John Lendrum, taken September 27, 2017

Page 293

1   Q   Do you recognize this as the affidavit that you

2       signed on June 1, 2015?

3   A   Yes.

4   Q   Do you know who Debra Schneider is?

5   A   She's a notary in my office.

6   Q   She's somebody who works for you?

7   A   Yes.

8   Q   You understood the importance of telling the

9       truth in connection with this affidavit?

10  A   I understood the importance of telling the

11      truth as I knew it at the time I made the

12      statement, yes.

13  Q   Did you understand that this was a document

14      that was going to be submitted to the federal

15      government to rebut Sue Goodsite's EEOC charge?

16  A   Yes.

17  Q   Did you review Sue Goodsite's EEOC charge?

18  A   I read it.

19  Q   At the time that it was filed or served on the

20      Board?

21  A   Yes.

22      (Plaintiff's Exhibit 108 was marked.)

23  Q   I'm handing you what has been marked as Lendrum

24      Exhibit 108.

25          Do you recognize Lendrum Exhibit 108 as

Deposition of John Lendrum, taken September 27, 2017

Page 294

```
 1        Sue Goodsite's first EEOC charge?
 2   A    Yes.
 3   Q    Do you recall receiving that around April of
 4        2015?
 5   A    I'm not sure of the exact date, but I remember
 6        receiving it.
 7   Q    Did you participate in the Board's or the
 8        school district's response to the EEOC charge?
 9   A    To the extent I was needed to provide
10        documents, yes.
11   Q    Did you review it before it was submitted?
12   A    The district's response?
13   Q    Yes.
14   A    No.
15   Q    Do you know if anybody did?
16   A    I'm sure --
17                  MR. HIRT:        Objection.
18            You can answer.
19   A    I'm sure that counsel reviewed it, but as an
20        individual Board member, I did not.
21   Q    Do you know if any Board member reviewed it
22        before it was submitted?
23   A    I do not know that.
24        (Plaintiff's Exhibit 109 was marked.)
25   Q    Lendrum Exhibit 109.
```