UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Sandra Goodsite,                                    Case No. 3:16-cv-2486

          Plaintiff

     v.                                             MEMORANDUM OPINION

Board of Education of the
Norwalk City School District,

          Defendant

## I.     INTRODUCTION

Plaintiff Sandra "Sue" Goodsite brought this action after Defendant Board of Education of

the Norwalk City Schools (the "Board") failed to promote her in 2014 and 2015 and did not renew

her contract for the 2015-2016 school year.  Goodsite contends the Board acted in a discriminatory

and retaliatory manner when making these decisions in violation of the Age Discrimination in

Employment Act of 1967 ("ADEA"), Title VII of the Civil Rights Act of 1964, and Ohio

discrimination law.

The Board moves for summary judgment on all of Goodsite's claims.  (Doc. No. 47).

Goodsite filed a memorandum in opposition, (Doc. No. 57), and the Board replied.  (Doc. No. 63).

## II.    BACKGROUND

Sue Goodsite began her 36-year career with Norwalk schools in 1978.  Over the years,

Goodsite climbed the ladder, starting as a home economics teacher and ending in the central-office

position of Director of Curriculum and Assistant Superintendent.  But, even with her success in the

district, Goodsite alleges she experienced hardships throughout her tenure because of the "old boys'

club" atmosphere at Norwalk.  Ultimately, Goodsite claims she was not promoted to Superintendent

and was ultimately discharged from employment because of this sex – and, eventually, age –

discrimination as well as her opposition to these alleged discriminatory practices. The events that give rise to these allegations are detailed below.

## A.    Goodsite's Employment Culminating in 2008 Letter

In 1993, Goodsite became the principal of Pleasant Elementary, one of Norwalk's three elementary schools. The principals of the other two elementary schools – Maplehurst and League – were men. Though all held the same position and were paid on the same salary scale, even though Pleasant and Maplehurst were notably larger than League, Goodsite contends she was treated less favorably than her male colleagues. The men, Goodsite alleges, were given new furniture, first choice when hiring teachers, and a chance to speak at principals' meetings. In sum, Goodsite claims then-Superintendent Virginia Poling "treated the men fabulously," (Doc. No. 49-2 at 125), while being openly hostile to Goodsite, making comments such as, "'I don't know why I don't like you, I just don't.'" (Doc. No. 49-1 at 207).

Although Goodsite alleges Poling's disparate treatment was noticed by her colleagues at the time, it was not formally brought to the Board's attention until 2008. At that time, Poling was no longer Superintendent, and Goodsite was no longer the Pleasant Elementary Principal. Instead, Wayne Babcanec was Superintendent, and Goodsite had been promoted to Director of Curriculum. Goodsite was promoted to the central-office position in 2006. When she took the job, then-Superintendent Babcanec promised Goodsite a 240-day contract beginning at Step Four of the salary schedule. But after she accepted, Babcanec told Goodsite the Board "wouldn't buy" the promised package. (Doc. No. 49-2 at 124). Rather than getting the promised package, she was given a less favorable a 260-day contract, beginning at Step Two.

In 2008, salaries were published in the newspaper, and Goodsite discovered she was making less per day than every other administrator, even a man with less seniority. Soon after, the position of Director of Student Services was posted. Based on her experience in 2006, Goodsite assumed this position would not be a 240-day contract and did not apply. Only after Bob Duncan was hired

to the position did Goodsite learn he was given a 240-day contract at a Step Nine. When Goodsite asked why he was given a higher salary, Babcanec stated, "He has five kids. What did you expect us to do?" (Doc. No. 49-1 at 33). In light of Goodsite's knowledge that Duncan had less seniority, education, and experience, Goodsite decided to voice her concerns of discrimination.

Goodsite brought this and years of other alleged sex discrimination to the Board's attention in a four-page, single-spaced letter. (Doc. No. 49-2 at 124-27). The letter was sent to Babcanec and the Board at the time, composed of Janet Broz, John Lendrum, Robert Ludwig, Mike Grose, and Scott Truxell. In the letter, Goodsite discussed Norwalk's "favoritism towards men," noting that women with more experience and education were "given far less than a male counterpart." (*Id.* at 127). Goodsite went on to detail numerous specific instances of perceived discrimination, which she advised she had "documented…so you are aware, and to show a pattern of actions." (*Id.* at 125). In addition to the alleged discrimination she had experienced at Pleasant with Poling, Goodsite took issue with the promises made, but not kept, by Babcanec himself.

After receiving the letter, then-Board President Ludwig sent Goodsite a letter scheduling a meeting with Goodsite, an unspecified member of the Board, and Babcanec. (Doc. No. 49-4 at 49). The letter advised:

> My understanding is that you informed Dr. Babcanec that you have an attorney representing you on this matter. If you like, you may bring your attorney with you to the meeting. In such a case, please inform Dr. Babcanec so that legal council [sic] for the Board of Education can also be in attendance.

(*Id.*).

Prior to the scheduled meeting, Board-member Broz sent Babcanec and the rest of the Board an email addressing Goodsite's letter. (Doc. No. 49-4 at 50). In the email, Broz disclosed her thoughts about the "fishy" situation that resulted in Duncan being "rushed through" as the Director of Student Services at the higher salary. (*Id.*). She also expressed her concern that Goodsite not be "intimidated, strong armed, or mistreated in any way, for coming forward and telling the truth."

(*Id.*).  Broz concluded her email with her personal opinion that she "did not believe [Norwalk's] female administrators were being treated equally."  (*Id.*).

Broz's email was not well-received by Ludwig and Lendrum.  Lendrum responded, "I don't agree with all of your points.  I am going to hold off on a response until after the meeting with Sue." (Doc. No. 49-4 at 51).  Ludwig replied, in part, "I find many of your remarks to be out of line and your accusatory suppositions extremely objectionable."  (Doc. No. 49-7 at 36).

These two men would go on to lead the "investigation" into Goodsite's allegations. Lendrum attended the scheduled meeting with Goodsite and Babcanec; Ludwig dictated the course of the "investigation."  Although multiple meetings were held with Goodsite, Lendrum, Ludwig, and Babcanec, Goodsite claims there was "resistance" and an "air of dismissal" from all.  (Doc. No. 49-1 at 224-27).  Ultimately, the Board did not pursue a true investigation of discrimination and decided not to do anything about it.  (*Id.* at 227-28, 230).  Instead, Lendrum advised Goodsite not to make the matter public as it "could be bad for Norwalk" so she made a pact not to discuss it.  (*Id.* at 103-04).

**B.      2014 Superintendent Hiring Process**

In May 2014, the Board enlisted North Point Educational Services Center ("NPESC") to perform the search for a new Superintendent.  (Doc. No. 57-8 at 46).  At the time, Ludwig and Lendrum were still on the Board in addition to three new members – Kevin Cashen, Steve Linder, and Ralph Ritzenthaler.  (*Id.*).  Lendrum was now Board President.  (*Id.*).  The NPESC representative who assisted in the search was Doug Crooks, a former Norwalk Assistant Superintendent.  (Doc. No. 48-10 at 71; Doc. No. 49-6 at 171, 240).

After the Superintendent position had been posted, but before the application period closed, the Board had discussed the possibility of an interim Superintendent.  (Doc. No. 48-2 at 121-22, 382; Doc. No. 48-10 at 69; Doc. No. 49-6 at 215-16, 220).  At this time, Crooks proposed that Will Folger be considered for the position of Interim Superintendent.  (Doc. No. 48-2 at 121-22, 382).

Folger did not apply for the Superintendent position, and, after the application period closed on June 27, 2014, the Board proceeded with a formal hiring process of those candidates who had applied.

Behind the scenes, Lendrum pursued the search for an interim Superintendent with Crooks and then-Superintendent Dennis Doughty. (Doc. No. 48-7 at 227, 272, 289, 292-99; Doc. No. 49-4 at 156, 175-83; Doc. No. 49-7 at 172). Interestingly, in 2009, Goodsite had complained about the Board's decision to hire Crooks as Assistant Superintendent over her in an informal hiring process, even though Goodsite believed she was more qualified for the position. (Doc. No. 49-1 at 40-51). Goodsite believed this to be an act of gender discrimination as the explanation she was given by then-Superintendent Doughty was that he needed a "'hatchet man'" and she was "'no hatchet man.'" (*Id.* at 46-48).

At any rate, before any applicant had been interviewed, Lendrum and Crooks contacted Folger about the interim Superintendent position on July 11, 2014. (Doc. No. 48-7 at 292-99; Doc. No. 49-4 at 175, 183). At the time, Ritzenthaler and Linder did not know the interim position was still being contemplated or that Lendrum would be speaking with Folger about filling that interim position. (Doc. No. 48-7 at 107; Doc. No. 48-10 at 80; Doc. No. 49-4 at 181). Ludwig knew Lendrum was still "working on a couple of interim names." (Doc. No. 49-7 at 174).

Days after Lendrum contacted Folger about the interim position, the Board interviewed five of the applicants. Goodsite, then the Assistant Superintendent and Director of Curriculum, was one of the five interviewed. Following the initial interviews, she was one of the three finalists for the position and the only female finalist. Then, one of the finalists removed himself from consideration, leaving only Goodsite and Jim Millet. Neither had experience as Superintendent, but both had Assistant Superintendent experience. (Doc. No. 48-2 at 408). In comparison to Goodsite's eight years of central office experience, Millet had only "limited central office experience." (*Id.*). In fact,

Cashen questioned whether Millet was overstating his experience and whether he should be hired in light of his inexperience. (*Id.*).

Even in light of Millet's inexperience and "lukewarm" reviews from Millet's former school district, (*id.*), the Board chose to offer Millet the permanent Superintendent position in a 3-2 vote on July 26, 2014. (Doc. No. 48-10 at 122). Ludwig, Lendrum, and Cashen voted for Millet; Linder and Ritzenthaler voted for Goodsite. (*Id.* at 123). But because of the split-board vote, Millet declined the offer. (*Id.* at 123-24).

With Millet out of the running, the Board agreed to offer Goodsite the position of interim Superintendent with Folger to be her Assistant Superintendent. (Doc. No. 48-7 at 96-98, 136-37; Doc. No. 48-10 at 124-26). Two days later, Folger attended the Board meeting. At the time, Ritzenthaler and Linder believed they were only meeting the new Assistant Superintendent, not interviewing Folger. (Doc. No. 48-7 at 138-39; Doc. No. 48-10 at 132-34). Neither had any materials on Folger from which to prepare for to interview him. (*Id.*). But three Board members – Ludwig, Lendrum, and Cashen – were prepared for to interview Folger at this meeting. (Doc. No. 48-10 at 132-34). These same Board members had been having private discussions throughout the hiring process. (Doc. No. 48-2 at 315, 381-83, 401-07; Doc. No. 48-7 at 224, 301-04, 310; Doc. No. 49-4 at 154, 186-89, Doc. No. 49-5 at 3; Doc. No. 49-7 at 167, 174-75, 182). And these same three Board members voted to hire Folger immediately after this "interview." (Doc. No. 48-10 at 134).

Because of "procedural irregularities" of this July meeting, the Board had to rescind the offer to Folger. (Doc. No. 49-3 at 236-37). Folger was officially hired a month later at a properly-announced Board meeting.

Following the 2014 hiring process, Goodsite was understandably frustrated and complained that she had once again been passed over for a man. In response, Lendrum told her "'You just better watch what bridges you burn. You don't know when you need to come back across those

bridges.'" (Doc. No. 49-1 at 140). He admits to saying this, specifying that he was referring to both "personal relationships" and "future employment." (Doc. No. 49-3 at 259).

## C. 2015 Hiring Process

Immediately after Folger was hired as interim Superintendent, the Board sought the services of the Ohio School Board Association ("OSBA") to aid in the search for a permanent Superintendent to begin in June 2015. (Doc. No. 49-10). Pursuant to the OSBA process, applicants submitted their applications to the OSBA who vetted the applicants in light of the Board's preferences. Cheryl Ryan of the OSBA was assigned to perform this task for Norwalk's Superintendent search.

Still the Assistant Superintendent and Director of Curriculum, Goodsite applied for the Superintendent position once again. Even though an impartial OSBA screening committee recommended Goodsite be interviewed, (Doc. No. 49-10 at 81), the Board chose not to do so. Like the decision to hire Folger in 2014, this was also a 3-2 decision with Ludwig, Lendrum, and Cashen voting not to interview Goodsite. (Doc. No. 49-6 at 265). Lendrum explained the Board's decision to Goodsite in the following voicemail on February 5, 2015:

> Hey, Sue, it's John Lendrum here. … I have the rest of the Board with me. We have gone through the initial screening on the applicants; there were 21 people that applied for the Superintendent's position. We have selected 7 names to do first interviews on the 10th and the 11th. We wanted to let you know that you are not in that list to be interviewed. … We looked at people --nobody that was in a retire or rehire situation and nobody that had more than 27 years of total experience is what we looked at. Looking for longevity and previous administration experience. …

(Doc. No. 57-19 at 1; Doc. No. 57-18 at 2). Goodsite also testified that, on returning the call, Lendrum stated they were looking for a "young up-and-comer." (Doc. No. 57-13 at 9).

Ultimately, the Board chose to hire 41-year-old George Fisk. (Doc. No. 48-2 at 708). At the time, he had three years of Superintendent experience at East Palestine City Schools and broke his contract with East Palestine Schools to take the Superintendent position at Norwalk. (Doc. No. 48-2 at 564; Doc. No. 49-3 at 291-92).

**D.      Failure to Renew Goodsite's Contract for the 2015-2016 School Year**

After Fisk was hired, Goodsite filed an EEOC Charge of Discrimination with the Ohio Civil Rights Commission on April 7, 2015.  (Doc. No. 49-2 at 131).  In the charge, Goodsite alleged age and sex discrimination as well as retaliation.  In support, Goodsite addressed her 2008 complaint of sex discrimination, the 2014 failure to promote, and the 2015 failure to promote.

Even in light of this alleged discrimination, Goodsite wanted to keep working at Norwalk.  Although her employment contract was set to expire at the end of the 2014-2015 school year, she notified some if not all of the Board members as well as then-Superintendent Folger of her desire to have her contract renewed for the following year and stay at Norwalk – her "home."  (Doc. No. 49-1 at 174-78, 179-81).  She did not speak to Fisk.  (Doc. No. 49-1 at 179).

Despite her efforts and her decades-long service to the district, no one would speak to her about renewal.  Hearing nothing, Goodsite sent her "Retirement Letter" to Fisk, Folger, and the Board on June 28, 2015.  (Doc. No. 49-1 at 181-83).  In the letter, Goodsite stated,

> To date, June 26, 2015, no one has spoken with me about the potential of coming back next year to work full-time, part-time or during a transition period as the assistant superintendent for a new superintendent.  Thus <u>it is my assumption that I will not be returning to the district</u> as I am on a one-year retire-rehire contract.  I have proceeded until the last couple of weeks with the <u>thought that I may be returning or at least work with and mentor a new person</u>.  However, I now feel the latter will not be the case as school is out for staff/students/most admin, the interim superintendent is gone, the new superintendent is beginning work on extended days, and no one has spoken to me about another contract or additional days for transition purposes.

(Doc. No. 49-2 at 118) (emphasis in original).  A few days after this letter was sent, Goodsite emailed Fisk again, stating her qualifications and expressing her interest "in consulting and/or part-time employment opportunities."  (*Id.* at 121).

After receiving her letter, Fisk decided to do away with the Assistant Superintendent job and create a new position – Director of Operations.  (Doc. No. 47-8 at 2).  This position shared many responsibilities with that of the former Assistant Superintendent and Curriculum/Grants Director formerly held by Goodsite.  (*Compare* Doc. No. 47-7 at 192-94 *with* Doc. No. 49-2 at 93-94; *see also*

Doc. No. 47-8 at 2-3). Of Fisk's three proposed choices to fill this position, Norwalk middle school principal, 38-year-old Corey Ream, was hired. (Doc. No. 47-8 at 3; Doc. No. 48-2 at 708; Doc. No. 48-10 at 187). When Goodsite's contract expired, Ream began working in Goodsite's former office as Director of Operations. (Doc. No. 48-10 at 39-40). At the time depositions were taken on this case at Norwalk in October 2017, the office was still marked "Assistant Superintendent." (Doc. No. 57-13 at 14, 23).

On May 10, 2016, Goodsite filed another EEOC Charge of Discrimination, alleging the nonrenewal of contract was also an act of age discrimination, sex discrimination, and retaliation. (Doc. No. 49-2 at 132). Goodsite then filed this action on October 11, 2016. (Doc. No. 1). On March 1, 2017, Goodsite filed an amended complaint alleging the Board's decision to hire Folger in 2014, Fisk in 2015, and not renew Goodsite's contract in 2015 each gave rise to claims of age and sex discrimination and retaliation. (Doc. No. 17). Since then, Goodsite has conceded the Board's decisions to hire Folger in 2014 and Fisk in 2015 do not give rise to an age retaliation claim. (Doc. No. 57 at 32 n.145). Therefore, I grant the Board's motion on these claims.

### III. STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

# IV.    DISCUSSION

Both Title VII and the ADEA "provide[ ] remedies to employees for injuries related to discriminatory conduct and associated wrongs by employers." *Univ. of Tex. S. Med. Ctr. v. Nassar*, 570 U.S. 338, 342 (2013) (discussing Title VII but considering the ADEA a "separate but related statute").  These anti-discrimination statutes prohibit two categories of conduct.  First, each prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's" "age" or "sex."  29 U.S.C. § 623(a)(1) (ADEA as to "age"); 42 U.S.C. § 2000e-2(a)(1) (Title VII as to "sex").  Second, the employer is prohibited from retaliating against an employee "on account of an employee's having opposed, complained of, or sought remedies for, unlawful workplace discrimination." *Nassar*, 570 U.S. at 342 (interpreting 42 U.S.C. § 2000e-3(a) (Title VII), which is nearly identical to 29 U.S.C. § 623(d) (ADEA)).

Goodsite's Title VII and ADEA claims may be proven by direct or circumstantial evidence. *See, e.g.*, *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009) (ADEA discrimination); *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008) (all retaliation claims); *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 238 (6th Cir. 2005) (sex discrimination).  If circumstantial evidence is used, the claim is analyzed under the *McDonnell Douglas/Burdine* burden-shifting framework.[1]  *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).

Accordingly, for all claims which Goodsite seeks to prove by circumstantial evidence, the burden is first on Goodsite to establish a *prima facie* case of discrimination or retaliation by a

---

[1] "[T]he *McDonnell Douglas/Burdine* burden-shifting framework does *not* apply to the summary judgment analysis of Title VII mixed-motive claims." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008).  But Goodsite does not allege any of her Title VII claims, including the "sex plus age" claims, should be analyzed as a "mixed-motive" claim.  Therefore, I will analyze all claims proven by circumstantial evidence under the *McDonnell Douglas/Burdine* burden-shifting framework and consider any plausibly stated mixed-motive claim abandoned.  *See Thompson v. City of Columbus*, No. 2014 WL 1814069, at *5 n.2 (S.D. Ohio May 7, 2014) (holding the same in an analogous "sex plus age" and "age plus sex" discrimination situation).

preponderance of the evidence. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252 (1981). If she does so, the burden shifts to the Board "'to articulate some legitimate, nondiscriminatory reason'" for the adverse employment action. *Id.* (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Finally, Goodsite must then "prove by a preponderance of the evidence that the legitimate reasons offered by [the Board] were not its true reasons, but were a pretext for discrimination." *Id.* She may establish pretext by showing:

> (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the Board]'s action, or (3) that they were insufficient to motivate [the Board]'s action.

*Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009) (citation omitted).

But these are not meant to operate as rigid categories, instead "[p]retext is a commonsense inquiry: did the employer fire the employer for the stated reason or not?" *Id.* at 400 n. 4. "[A]t bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Id.* (citing *St. Mary's Honor Ctr.*, 509 U.S. at 515). "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515.

## A.     2014 Failure to Promote

Goodsite claims the Board's decision to hire Folger[2] as interim superintendent in 2014 rather than promote her to permanent Superintendent was an act of age and sex discrimination as well as retaliation motivated by her earlier complaints of sex discrimination.

---

[2] Goodsite briefly alleges the Board's first choice to hire another man, who declined the offer, also gives rise to recovery. But, as the Board correctly notes, because Goodsite did not raise this allegation in her EEOC Charge or even mention the offer to the other man in the amended complaint, she may not raise it now in her memorandum in opposition. *See Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) ("To the extent Bridgeport seeks to expand its claims to assert new theories, it may not do so in response to summary judgment or on appeal."); *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (holding the non-movant could not raise a new legal claim for the first time in opposition to a motion for summary judgment).

Because Goodsite seeks to prove these claims by circumstantial evidence, all are analyzed under the *McDonnell Douglas/Burdine* burden-shifting framework.

## 1.    Sex Discrimination *Prima Facie* Showing

To satisfy her *prima facie* burden with respect to this Title VII "failure-to-promote" claim, Goodsite must show:

> (1) she is a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time plaintiff's request for the promotion was denied.

*White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 240 (6th Cir. 2005) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 562-63 (6th Cir. 2000)). Apparently conceding the first three elements, the Board argues only that Folger and Goodsite were not similarly qualified. (Doc. No. 47 at 16).

When analyzing this element, the court must compare the qualifications of the two, independent of the employer's proffered nondiscriminatory reasons. *White*, 429 F.3d at 242-44. Viewing Goodsite and Folger's resumes side-by-side, there is evidence from which a reasonable jury could find Goodsite and Folger were similarly situated. (*Compare* Doc. No. 47-7 at 185-88 *with* Doc. No. 48-2 at 560-63).

Both had similar career trajectories. Folger began teaching in 1974; Goodsite, 1978. (*Id.*). Folger became an assistant principal in 1987; Goodsite, 1989. (*Id.*). Folger was promoted to principal in 1992; Goodsite, 1993. (*Id.*). Then in 2004, Folger became a Superintendent and served in that position until retirement in 2013. (Doc. No. 47-7 at 185). Though Goodsite was promoted to other administrative positions, including Assistant Superintendent, she was never Superintendent. (Doc. No. 48-2 at 560). But since Goodsite worked for Norwalk schools for her entire 36-year career, she arguably had more institutional experience than Folger, who had worked in several different school systems but never Norwalk. (Doc. No. 47-7 at 185; Doc. No. 48-2 at 560-61).

Not only did Folger and Goodsite have similar experience, but the two also possessed comparable educational credentials. Both earned education-related master's degrees from Bowling

Green State University.  (Doc. No. 47-7 at 185; Doc. No. 48-2 at 560).  Both had doctorate degrees in fields related to education administration.  (*Id.*).  Both were trained in education administration and supervision.  (*Id.*).  The only notable difference was Folger's juris doctor, a credential which was not required for the position.  (Doc. No. 48-2 at 204).

Because the two possessed comparable educational credentials and experience, there is sufficient evidence from which a reasonable juror could conclude they were similarly qualified for the position at the *prima facie* stage.  *See Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 814 (6th Cir. 2011).  Thus, Goodsite has satisfied her *prima facie* burden.

## 2.    Age Discrimination *Prima Facie* Showing

Goodsite contends the decision to hire Folger as interim Superintendent was an act of age discrimination because the position of Superintendent remained open and the Board continued to seek applicants to fill that permanent position.  (Doc. No. 57 at 31-32).  First, because Goodsite did state facts in the complaint regarding the Board's decision to hire Folger on only an interim basis and immediately pursue the search for a permanent Superintendent, (Doc. No. 17 at 5), I reject the Board's argument that this is a new theory of recovery.

Second, contrary to the Board's assertion that Goodsite cannot establish a "failure-to-promote" using this means, the *White* court stated this alternative means was still available but simply did not apply in that case or *Nguyen*.  *White*, 429 F.3d at 240 n.3.  Therefore, Goodsite can meet her *prima facie* burden by showing:

> 1) that [s]he is a member of a protected class; (2) that [s]he applied for a job and was rejected; (3) that [s]he was qualified for the job; and (4) that the employer continued to seek job applicants after the plaintiff was rejected.

*Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1463-64, n.6 (6th Cir. 1990) (citing *McDonnell Douglas*, 411 U.S. at 802).  Like the sex discrimination claim discussed above, the first three elements are satisfied, and the fourth element is disputed.

Here, the evidence suggests the Board was seeking to fill the permanent Superintendent position in 2014. When the position was initially posted in 2014, the Board was seeking applicants to be permanent Superintendent. The Board then offered the permanent position to Millet. Only after he declined the offer did the Board consider filling the Superintendent position on an interim basis. Immediately after Folger was hired as interim Superintendent, the Board began the hiring search for a permanent Superintendent. Viewing this evidence in the light most favorable to Goodsite, a reasonable jury could conclude the permanent Superintendent position remained open after Goodsite was rejected. Therefore, Goodsite has met her *prima facie* burden.

### 3. Title VII Retaliation *Prima Facie* Showing

Beyond discrimination alone, Goodsite also alleges the Board's decided not to promote her in retaliation for the letter she sent in 2008 alleging sex discrimination. To establish a *prima facie* case of retaliation, Goodsite must show:

> (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Russell v. Univ. of Toledo*, 537 F.3d 596, 609 (6th Cir. 2008) (further citation omitted). The fourth prong "requires proof of so-called 'but-for' causation, meaning that the plaintiff must furnish evidence that 'the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Mys v. Mich. Dep't of State Police*, 886 F.3d 591, 600 (6th Cir. 2018) (quoting *Nassar*, 570 U.S. at 360). The Board contests all but the third element of this test. (Doc. No. 47 at 36-38).

### i. Protected Activity

To establish the protected-activity element, Goodsite need only show that she "challenged an employment practice that [s]he reasonably believed was unlawful." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir 2015) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580

(6th Cir. 2000)). While this challenge must be more than "a vague charge of discrimination[,]" "absolute formality, clarity, and precision" is not required. *Yazdian*, 793 F.3d at 645 (internal quotations omitted).

The alleged protected activity here is a letter sent by Goodsite in 2008. The Board first argues the letter was too vague to constitute protected activity. (Doc. No. 47 at 36). I disagree. In the four-page, single-spaced letter, Goodsite explicitly opposes Norwalk's practice of "favoritism toward the men" in the district over women, including herself. (Doc. No. 49-1 at 200; Doc. No. 49-2 at 124-27). The letter cites numerous specific examples of this practice of disparate treatment between men and women, including pay discrepancies, priority of resources, and preferences in hiring and promoting. (Doc. No. 49-2 at 124-27; Doc. No. 57 at 32-33).

The Board at the time interpreted the letter as a charge of sex discrimination. (Doc. No. 49-3 at 65, 72, 75; Doc. No. 49-4 at 50). Soon after the letter was received, a meeting was scheduled to address the concerns raised in her letter. (Doc. No. 49-4 at 49). The letter scheduling the meeting referred to the Board's knowledge that Goodsite had "an attorney representing her on this [gender-discrimination] matter," and advised that she could have such legal counsel present if she wished. (*Id.*). Further, the Board's attorney was copied on this scheduling letter. (*Id.*).

From the contents of the letter and the Board's reaction to it, a reasonable jury could conclude the letter was Title VII "protected activity."

### ii. Knowledge of Protected Activity and Causation

Because the decisionmaker in this case was a "split" Board, the Board will be "liable for actions that it would not have taken 'but for' members acting with improper motive." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 262 (6th Cir. 2006) (citing cases); *see e.g., Kuivila v. City of Newton Falls, Ohio*, No. 4:14-cv-1593, 2016 WL 541478, at *14-*15 (N.D. Ohio Feb. 11, 2016) (applying this standard to a Title VII case); *Egli v. Congress Lake Club*, 2010-Ohio-2444, 2010 WL 2184062, at *5 (applying this standard to an Ohio sex discrimination case). Specifically, "where

improperly motivated members supply the deciding margin, the board itself is liable." *Scarbrough*, 470 F.3d at 262.

Before analyzing the facts of this case, I will briefly discuss the application of the "deciding-margin" standard to the knowledge prong of the *prima facie* case. The Board alleges, "[t]he 'deciding margin' test may apply to a retaliation claim to satisfy the forth prong (causation between the protected activity and the adverse action), but it is not a substitute for establishing the second prong, that the employer knew about the protected activity." (Doc. No. 63 at 19). Essentially, the Board argues the "deciding margin" is free to act with a retaliatory motive so long as the rest of the Board does not know of the deciding margin's illicit motive. I reject the Board's nonsensical argument and conclude Goodsite need only show the "deciding margin" knew of her protected activity and would have voted for her "but for" that activity.

In this case, because the vote for Folger was 3-2, the "deciding margin" is one member of the three-man majority. *See, e.g., Kendall v. Urban League of Flint*, 612 F. Supp. 2d 871, 881 (E.D. Mich. 2009) (explaining that, in a 6-8 decision, the "deciding margin" was two members of the fourteen-member board). Therefore, to satisfy her *prima facie* burden, Goodsite must show Ludwig, Lendrum, *or* Cashen knew of the letter and, "but for" that letter, he would have voted for Goodsite.

Both Ludwig and Lendrum were Board members of the Board in 2008. Each received the Letter and actively participated in the Board's response to it. (Doc. No. 49-1 at 99-100; Doc. No. 49-2 at 124). Ludwig was president of the Board at the time and scheduled the meeting with Goodsite, Babcanec, and an unspecified Board member to address the Letter. (Doc. No. 49-4 at 49). Lendrum was chosen as the Board member to attend this meeting and was charged with "gather[ing] information and tak[ing] that [information] back to the Board." (Doc. No. 49-3 at 90). As such, there is evidence that both Ludwig and Lendrum had personal knowledge of Goodsite's protected activity.

Thus, the only remaining question is whether there is evidence that one of these men would have voted for Goodsite "but for" her protected activity. In this case, there is.

First, as discussed above, Lendrum and Ludwig acted with resistance and dismissal towards Goodsite's allegations from the time the Board received the Letter. While each had meetings with Goodsite and Babcanec, neither believed Goodsite's allegations of discrimination and both refused to pursue a true investigation of Goodsite's allegations. Instead, Lendrum advised Goodsite not to make the matter public as it "could be bad for Norwalk," so she made a pact not to discuss it. (*Id.* at 103-04).

Following Goodsite's 2008 protected activity, Broz testified that Lendrum "seemed to hold a personal vendetta against Sue. Whenever Sue would speak, Lendrum would roll his eyes or act in a dismissive or disinterested way. The letter changed Lendrum's view of Sue, such that he did not trust her anymore." (Doc. No. 57-4 at 2). Ritzenthaler corroborated this, stating, "something went on" in 2008 and Lendrum and Ludwig were not "happy" with Goodsite. (Doc. No. 48-10 at 44-45). Doughty also spoke of "friction" between Goodsite and certain members of the Board, due to "a threat of a lawsuit in the past." (Doc. No. 48-4 at 94-96).

Beyond their historically rocky relationship with Goodsite, Lendrum and Ludwig's conduct during the 2014 hiring process shows the animosity they held for Goodsite since she engaged in protected activity in 2008. Most overtly is Lendrum's conduct during Goodsite's interview, when he made disrespectful comments and privately noted: "loyal unless writing letters." (Doc. No. 48-7 at 118; Doc. No. 49-3 at 167; Doc. No. 49-4 at 194).

But, even before Goodsite was interviewed, Lendrum began pursuing Folger for interim Superintendent without the knowledge of the entire Board. After the interviews were conducted, and Millet and Goodsite were the two finalists, Lendrum and Ludwig voted to hire Millet, a male candidate with objectively inferior experience to Goodsite, as permanent Superintendent. When Millet rejected the offer because of the split-Board decision, the full Board decided to hire Goodsite

as interim Superintendent with Folger to be her Assistant principal. Two days later, Ritzenthaler and Linder arrived at the Board meeting intending to meet Folger and make their decision official. But, Ludwig, Lendrum, and Cashen, who had been having private discussions throughout the hiring process, changed course and were prepared to interview Folger for interim Superintendent. Following this "interview," Ludwig, Lendrum, and Cashen voted to hire Folger as interim Superintendent over the objection of Ritzenthaler and Linder. But due to "procedural irregularities" of this meeting, the offer had to be rescinded until a properly-announced meeting was conducted a month later, at which time Folger was officially hired as interim Superintendent.[3]

When Goodsite expressed her frustration at the situation, Lendrum advised her to "watch what bridges you burn. You don't know when you need to come back across those bridges.'" (Doc. No. 49-1 at 140). He admits to saying this, specifying that he was referring to both "personal relationships" and "future employment." (Doc. No. 49-3 at 259).

From this evidence, a reasonable jury could conclude Lendrum, and possibly Ludwig, would have voted for Goodsite "but for" her 2008 Title VII protected activity. The Board urges me to conclude the inference of discrimination or ill motive is defeated by the "same-actor" inference since Lendrum and Ludwig had voted to promote Goodsite to the position of Assistant Superintendent and Director of Curriculum in the years between her protected activity and the 2014 hiring process. (Doc. No. 47 at 19; Doc. No. 63 at 47-48). But the Sixth Circuit has held that the "same-actor" inference "is insufficient to warrant summary judgment for the defendant if the employee has otherwise raised a genuine issue of material fact." *Wexler v. White's Furniture, Inc.*, 317 F.3d 564, 573-74 (6th Cir. 2003).[4] Because Goodsite has raised a genuine dispute of material fact,

---

[3] All Board members signed on to the resolution to hire Folger as Superintendent. (Doc. No. 48-10 at 319-20). But the evidence suggests Ritzenthaler and Linder continued to voice their opposition to this decision. (Doc. No. 48-7 at 318; Doc. No. 48-10 at 321-22).
[4] The *Wexler* court also explicitly rejected the "same-group" inference, which the Board later enlists to defeat the 2016 renewal of contract ADEA claim, (Doc. No. 47 at 35). 317 F.3d at 574.

the "same-actor" inference is insufficient to warrant summary judgment. Instead, I conclude Goodsite has set forth sufficient evidence to establish a *prima facie* case of retaliation.

### 4.     Pretext of the Board's Reasons

The Board propounds no less than nine allegedly non-discriminatory, non-retaliatory reasons for its decision to hire Folger over Goodsite. (Doc. No. 47 at 18-19). In light of the "split-board" decision and the retaliation claim discussed above, those reasons attributed to Lendrum and Ludwig are relevant here. Those reasons are: (1) preference for someone with prior Superintendent experience; (2) preference for someone with management-side collective bargaining experience; (3) preference for someone with experience managing all financial aspects of a school district; (4) belief that Goodsite interviewed poorly; (5) lack of support from former Superintendents Poling, Babcanec, and Doughty; and (6) Ludwig's "appreciation" of Folger's law degree.

Generally, the employee is required to show all of the proffered reasons are pretext. *See Smith v. Chrysler Corp.*, 155 F.3d 799, 809 (6th Cir. 1999). But the Sixth Circuit has cautioned "that an employer's strategy of simply tossing out a number of reasons to support its employment action in the hope that one of them will 'stick' could easily backfire." *Id.* That is,

> "There may be cases in which the multiple grounds offered by the defendant for the adverse action of which the plaintiff complains are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 70 (7th Cir. 1995).

*Id.* This case falls within this narrow exception.

First, the Sixth Circuit has held that "any evaluation of [ ] interview performance" is not a legitimate nondiscriminatory reason because it "is an inherently subjective determination, and thus easily susceptible to manipulation in order to mask the interviewer's true reasons for making the promotion decision." *White*, 533 F.3d at 394-95. As explained in *White*, "since the very issue in dispute is whether the reasons given by these interviewers for their decision should be believed, it would be highly inappropriate for us to assume … that their own subjective perceptions of [Goodsite] were accurate." *Id.* Therefore, Ludwig's perception that Goodsite's interview responses

on certain topics were "lacking," (Doc. No. 49-6 at 231), and the fact that Lendrum did not get a "good feeling" about Goodsite's experience, (Doc. No. 49-3 at 260-61), are not legitimate but "self-serving and conclusory." *See White*, 533 F.3d at 395. The Board's use of this reason explicitly rejected by the Sixth Circuit raises suspicions of the rest of its reasons.

Second, Ludwig and Lendrum's alleged reliance on the opinions of former Superintendents Babcanec and Polling is also suspect. A reasonable jury could conclude this was merely a pretext for discrimination since both Ludwig and Lendrum knew of Goodsite's previous allegations of sex discrimination and disparate treatment by both of these Superintendents.

Third, and most importantly, is the "fishy" hiring process discussed above. Without the knowledge of Ritzenthaler and Linder, Lendrum pursued a search for interim Superintendent before interviews had even begun. After interviews were conducted, Ludwig, Lendrum, and Cashen voted to offer Millet the position of permanent Superintendent, even though he, like Goodsite, had no Superintendent experience and was less experienced overall. Then, when Millet rejected the offer and the full Board agreed to offer Goodsite the position of interim Superintendent and Folger that of Assistant Superintendent, Lendrum, Ludwig, and Cashen instead decided to interview Folger at the Board meeting to the surprise of Ritzenthaler and Linder, who had no information about Folger from which to conduct a proper interview. Ultimately, at this same meeting, Ludwig, Lendrum, and Cashen voted to hire Folger as interim Superintendent, a decision which had to be redone because of "procedural irregularities" of the meeting.

Further bolstering the inference that the Board's decision was an act of sex discrimination is the "old boys' club" atmosphere at Norwalk. Goodsite was not the only person to recognize the disparate treatment between men and women at Norwalk schools. In 2008, Broz expressed her personal opinion that she "did not believe [Norwalk's] female administrators were being treated equally." (Doc. No. 49-4 at 50). Seven years later, Norwalk employees reported that the "good old boys" network, "fostered…for a long time" at Norwalk was still in play but needed to end. (Doc.

No. 49-9 at 77-78; Doc. No. 49-10 at 59, 62-63). Although the Board urges me not to consider the third-party allegations of the "old boys' club," "[c]ircumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant's workplace in turn may serve as circumstantial evidence of individualized discrimination directed at the plaintiff." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998).

In sum, considering the Board's flawed reasons, along with the "fishy" hiring process and the sexism observed in the district, a reasonable juror could conclude the Board's – specifically Ludwig and Lendrum's – reasons to hire Folger over Goodsite were merely pretext for sex discrimination and retaliation. Therefore, a genuine dispute of material fact remains and the Board's motion for summary judgment of the sex discrimination and retaliation claims is denied.

The analysis is not complete for Goodsite's age discrimination claim. For the ADEA claim to survive summary judgment, Goodsite must "prove by a preponderance of the evidence that 'age was the "but-for" cause of the employer's adverse action.'" *Alberty v. Columbus Twp.*, 730 F. App'x 352, 357 (6th Cir. 2018) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)).

Here, Lendrum and Ludwig initially voted to hire a younger man to be permanent Superintendent. While there is evidence that Goodsite was contemplated for the interim position, the Board never considered Goodsite or Folger, who were both older, to be permanent Superintendent. Instead, the Board intended to continue searching for a permanent Superintendent.

When Goodsite applied for the permanent position, she was denied an interview. In explanation for the decision, Lendrum informed Goodsite the Board was not looking at anyone "in a retire or rehire situation" or anyone with "more than 27 years of total experience." (Doc. No. 57-19 at 1; Doc. No. 57-18 at 2). Instead, the Board was looking for a "young up-and-comer." (Doc. No. 57-13 at 9). Ultimately, the Board did not interview anyone older than Goodsite and selected someone more than fifteen years younger.

But, even in light of these facts, I cannot conclude there is sufficient evidence to show Goodsite's age was the "but-for" cause of the Board's decision not to hire Goodsite as permanent Superintendent in 2014. This is so because the evidence suggests reasons other than Goodsite's age influenced Ludwig and Lendrum to vote not to hire Goodsite for even the interim Superintendent position when given the choice between her and an older man. Therefore, because Goodsite cannot show the Board would have hired her as permanent Superintendent "but-for" her age, the Board is granted summary judgment on this age discrimination claim.

## B.  2015 Failure to Interview

Unlike 2014, Goodsite was not given the opportunity to interview for the Superintendent position in 2015. Goodsite alleges the Board's decision was motivated by sex discrimination, age discrimination, or retaliation for her 2008 protected activity. Like her 2014 claims, Goodsite seeks to prove her sex discrimination and retaliation claims by circumstantial evidence. Therefore, the *McDonnell Douglas/Burdine* burden-shifting framework applies to these claims. But because Goodsite alleges direct evidence supports her age discrimination claim, the *McDonnell Douglas/Burdine* burden-shifting framework does not apply to her ADEA claim.

### 1.  Age Discrimination *Prima Facie* Showing

To defeat summary judgment on the ADEA claim, Goodsite sets forth direct evidence of age discrimination. She will succeed only if the "evidence, if believed, requires the conclusion that age was the 'but for' cause of the employment decision." *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 530 (6th Cir. 2014); *see also Gross*, 557 U.S. at 180. Due to the "but-for" burden of proof, direct evidence of age discrimination may not automatically establish a genuine issue of material fact. *Id.* at 532. Instead, "even when direct evidence of age discrimination has been offered, the question to be asked in deciding an employer's motion for summary judgment is whether the evidence, taken as a whole and in the light most favorable to plaintiff, is sufficient to permit a rational trier of fact to conclude 'that age was the "but-for" cause of the challenged employer decision.'" *Id.*

Goodsite alleges the voicemail, transcribed below, left by a member of the Board, provides the requisite direct evidence:

> Hey, Sue, it's John Lendrum here. … I have the rest of the Board with me. We have gone through the initial screening on the applicants; there were 21 people that applied for the Superintendent's position. We have selected 7 names to do first interviews on the 10th and the 11th. We wanted to let you know that you are not in that list to be interviewed. … We looked at people --nobody that was in a retire or rehire situation and nobody that had more than 27 years of total experience is what we looked at. Looking for longevity and previous administration experience. …

(Doc. No. 57-19 at 1; Doc. No. 57-18 at 2). Goodsite also testified that, on returning the call, Lendrum stated they were looking for a "young up-and-comer." (Doc. No. 57-13 at 9).

First, the Board contends these statements are not attributable to the entire Board since they were made by Lendrum. (Doc. No. 63 at 36). But because the decision not to interview Goodsite was a 3-2 split-Board decision, (Doc. No. 49-6 at 265), the "deciding-margin" standard applies. Therefore, because Lendrum was part of the majority who voted not to hire Goodsite, the claim may survive on his comments alone.

Moving on to the statements themselves, because retirement-related statements "would require an inference to conclude that retirement was a proxy for age," these statements are not direct evidence of age discrimination. *Scheick*, 766 F.3d at 531. Likewise, "[s]ince age and years of service are 'analytically distinct,' a decision based on years of service is 'not necessarily "age-based."'" *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993)).

But the statement that the Board's hiring decision was made because it wanted a "young up-and-comer" provides the requisite direct evidence. *See Scheick*, 766 F.3d at 531 (holding statements that the Board wanted "someone younger" to be direct evidence of age discrimination); *see also Alberty*, 730 F. App'x at 357 (emphasizing the fact that the statements made in *Scheick* were made in the employment decision-making context).

The Board counters that the "young up-and-comer" statement is not direct evidence of age discrimination since two of the candidates chosen for an interview were 53 and 48 years old, respectively. (Doc. No. 63 at 36). But this does not defeat the fact that desiring a "young" Superintendent is discriminatory. Further, the fact that the Board ignores the fact that each of the applicants interviewed was, in fact, younger than Goodsite is additional evidence that the Board discriminated based on age when choosing which candidates to interview.

While Lendrum's statement that all applicants with over 27 years of experience were excluded is not direct evidence of age discrimination, it does raise suspicions. This is especially so in light of the fact that, immediately after this statement, Lendrum stated the Board was "[l]ooking for … previous administration experience." (Doc. No. 57-19 at 1; Doc. No. 57-18 at 2). Curiously, the Board interviewed candidates with no more than fourteen years of administration experience compared to Goodsite's twenty-six. (Doc. No. 49-10 at 80). Combined, Lendrum's statements and the Board's actions suggest the decision was an act of age discrimination.

Considering the evidence as a whole in the light most favorable to Goodsite, a genuine dispute of material fact remains as to whether Goodsite would have been interviewed "but for" her age. Therefore, the Board is denied summary judgment of this claim.

## 2. Title VII Claims

Goodsite claims the Board's decision to hire George Fisk rather than her in 2015 was an act of discrimination and retaliation. Because Goodsite seeks to prove these claims by circumstantial evidence, the *McDonnell Douglas/Burdine* framework is used to evaluate this claim.

### i. Discrimination *Prima Facie* Showing

Like the 2014 failure-to-promote claim, Goodsite must first satisfy her *prima facie* burden by demonstrating:

> (1) she is a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time plaintiff's request for the promotion was denied.

*White*, 429 F.3d at 240 (citing *Nguyen*, 229 F.3d at 562-63).  The Board contests only the third and fourth elements.

In its initial motion for summary judgment, the Board alleges Goodsite was not "considered" for the position because she was not interviewed.  (Doc. No. 47 at 20).  But, in its reply brief, the Board concedes that, "If Goodsite's claim is that discrimination took place when the Board declined to interview her, she can establish the 'considered' part of the third prong: the Board 'considered' whether to interview her."  (Doc. No. 63 at 37).  The Board then urges me to conclude that, if this is the case, "the comparator individuals are the seven applicants who were selected for interviews, not just Fisk."  (*Id.*).  The Board cites no authority for this position.

In reviewing the case law, it is clear that a plaintiff can be "considered for" a position even if she is not interviewed.  For example, in *White*, the plaintiff herself "argue[d] that she was not considered for the position because she was not granted an interview and neither the human resources employees who initially screened applications for minimum qualifications nor the members of the interviewing committee could remember reviewing her resume."  429 F.3d at 241 n.4.  But the Circuit affirmed the district court's holding that the "considered for" element was satisfied since the plaintiff "was considered at some stage of the hiring procedure or she would have not received the rejection letter."  *Id.*  The *White* court then held "that in order to satisfy the fourth prong of the *prima facie* burden in a failure to promote case, it is incumbent upon the plaintiff to establish that she and the non-protected person who ultimately was hired for the desired position had similar qualifications."  *Id.* at 242.  The *White* court then compared the qualifications of the plaintiff to only those of the person actually hired for the position, not the entire applicant pool or even the pool of interviewees.

In light of *White*, I reject the Board's arguments.  (Doc. No. 63 at 37).  Because it is undisputed that Goodsite was considered for and denied an interview, she has satisfied the third element of her *prima facie* burden.  The only remaining question is whether she and Fisk were

similarly qualified. *Provenzano*, 663 F.3d at 814 ("In a failure to promote claim, the emphasis in the fourth element is on the relative qualifications of the plaintiff and the employee who *actually received the promotion.*") (emphasis added). As with the 2014 Title VII failure-to-promote claim, this question can be answered by comparing Goodsite and Fisk's resumes.

Like Goodsite, Fisk started his career in education as a teacher. (Doc. No. 48-2 at 561 *with id.* at 565). Both Goodsite and Fisk were eventually promoted to elementary principal. But, prior to her promotion, Goodsite earned four years of leadership experience as Middle School Assistant Principal. (*Id.* at 560). Further, Goodsite earned thirteen years of administration experience as elementary principal compared to Fisk's five. (*Compare id.* at 560 *with id.* at 564-65). After serving as elementary principal, both were promoted to district-wide positions. (*Compare id.* at 561 *with id.* at 564). But, while Goodsite earned nine years of district-wide administration experience as Assistant Superintendent and Director of Curriculum, Fisk earned only three as Superintendent. (*Id.*).

Beyond Goodsite's more extensive administration experience, she was also more educated than Fisk. While Goodsite had an Educational Doctorate degree, Fisk possessed only a Master of Education. (*Compare id.* at 560 *with id.* at 564).

Finally, Goodsite had nearly forty years of institutional knowledge of Norwalk schools, nine of which were acquired while working as a district-wide administrator. (*Id.* at 560-61). Fisk, on the other hand, had never been employed by Norwalk schools. Instead, he had served as Superintendent of a school less than half the size of Norwalk. (Doc. No. 49-9 at 63; Doc. No. 49-10 at 80). In fact, Fisk's district was so small that it did not even warrant having an Assistant Superintendent. (Doc. No. 47-8 at 1)

Overall, Goodsite's superior administration experience, experience with Norwalk schools, and educational credentials counterbalances Fisk's three years of Superintendent experience. From this evidence, a reasonable jury could conclude Goodsite was similarly, if not more, qualified than Fisk. As such, Goodsite has met her *prima facie* burden.

## ii.    Retaliation *Prima Facie* Showing

Remaining is Goodsite's sex-related retaliation claim, in which she alleges the 2015 decision was also motivated by the same 2008 letter discussed above.  As stated above, to satisfy her *prima facie* burden with respect to the retaliation claim, Goodsite must show:

> (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Russell*, 537 F.3d at 609 (further citation omitted).

Although the Board continues to challenge whether the 2008 letter and following events was "protected activity," I again find this to be protected activity for the reasons stated above.  Further, there is evidence that Ludwig and Lendrum knew of this activity.  The final two prongs are disputed.

### a.    Adverse Employment Action

To establish the "adverse employment action" prong, Goodsite must only show "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citation and internal quotation marks omitted).

Rather than apply this 2006 Supreme Court precedent, the Board cites a single unpublished Sixth Circuit case, which predates *Burlington*, for its categorical assertion that "[n]ot being selected for an interview for a position is not a materially adverse employment action that satisfies the third element of a retaliation claim."  (Doc. No. 47 at 39; Doc. No. 63 at 38 (citing *Cook v. Caldera*, 45 F. App'x 371, 377 (6th Cir. 2002)).  But this statement ignores years of precedent following *Burlington*, including by the Sixth Circuit itself, which expressly disagreed with *Cook* following *Burlington*, stating, "we are not inclined to hold that denying an interview can *never* constitute a materially adverse employment action."  *Siegner v. Twp. of Salem*, 654 F. App'x 223, 232 (6th Cir. 2016).

Applying the *Burlington* standard, I conclude there is sufficient evidence from which a reasonable jury could find the Board's decision not to interview Goodsite for the superintendent position was an adverse employment action. As the *Siegner* court stated when discussing whether the failure to interview could rise to an adverse employment action, "'[c]ontext matters.'" 654 F. App'x at 232 (quoting *Burlington*, 548 U.S. at 69). In this case, Goodsite was not a random applicant with questionable qualifications but a loyal Norwalk employee who was qualified for the position. By denying Goodsite the opportunity to interview for the position, the Board effectively denied Goodsite the promotion. Had a reasonable worker known this would be the consequence of making or supporting a charge of discrimination, she likely would not do so.

**b.    Causation**

The decision not to interview Goodsite was again a 3-2 split-Board decision. Therefore, the "deciding margin" standard must apply here as well. Again, Goodsite can show causation with evidence that one member of the majority was improperly motivated by her protected activity.

As was the case in 2014, both Lendrum and Ludwig were in the three-member majority who voted not to interview Goodsite in 2015. As discussed above, there is evidence from which a reasonable jury could conclude that "but for" Goodsite's protected activity, Ludwig and Lendrum would have voted Goodsite to be Superintendent, or at least interim Superintendent, in 2014. There is no evidence that Lendrum or Ludwig changed course during the 2015 hiring process.

Instead, there is evidence that Lendrum acted with an even greater retaliatory motive. Specifically, in the face of Goodsite's complaint of the 2014 decision to hire a man over her, Lendrum's cautioned Goodsite to "watch what bridges you burn. You don't know when you need to come back across.'" (Doc. No. 49-1 at 140). Lendrum admitted this warning referred to both Goodsite's "personal relationships" and "future employment." (Doc. No. 49-3 at 259).

Considering the evidence in the light most favorable to Goodsite, I find there is sufficient evidence by which a reasonable jury could conclude that the retaliatory motive Lendrum and Ludwig

held in 2014 did not dissipate from 2014-2015, but instead intensified. Accordingly, there is evidence that "but for" her 2008 protected activity, Goodsite would have been interviewed in 2015.

### iii. Pretext of the Board's Reasons

Because Goodsite satisfied her *prima facie* burden for her Title VII claims, the burden shifts to the Board to state a nondiscriminatory reason for failing to interview Goodsite in 2015. Like its 2014 reasons, the Board restates its desire for prior Superintendent experience and management-side collective bargaining experience. (Doc. No. 47 at 22-23). The Board also alleges "[i]t remained troublesome" that the previous superintendents did not support her candidacy. (Doc. No. 47 at 23).

As discussed above, any reliance on the opinions of former Superintendents Poling and Babcanec is suspect in light of Goodsite's previous complaints of sex discrimination by both of these individuals. A reasonable jury could conclude this was merely a pretext for sex discrimination.

Regarding the Board's preferred qualifications, Goodsite argues these should be rejected since they were not the reasons the Board gave at the time she was denied an interview. "An employer's changing rationale for making an adverse employment decision can be evidence of pretext.'" *Cicero v. Brog-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002) (quoting *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996)). But, "providing *additional*, non-discriminatory reasons that do not conflict with the one stated at the time of [the adverse action] does not constitute shifting justifications." *Miles v. S. Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 891 (6th Cir. 2020). Accordingly, I must evaluate whether these additional reasons conflicted with those given at the time and, if they did not, whether they were non-discriminatory or a pretext for discrimination.

When Goodsite was initially notified of the decision, Lendrum did state that the Board was looking for "previous administration experience." (Doc. No. 57-19 at 1; Doc. No. 57-18 at 2). On its face, this does not conflict with a preference for previous Superintendent experience. But the Board's decision to interview a candidate with no Superintendent or Assistant Superintendent

experience calls into question whether this reason was legitimate or pretextual. (Doc. No. 49-6 at 279). In fact, Ludwig stated he would have voted to hire the inexperienced candidate, had she not accepted another position. (*Id.*). Viewing this evidence in the light most favorable to Goodsite, a reasonable jury could conclude Superintendent experience was not the true reason for its decision not to interview Goodsite.

Remaining is the Board's alleged preference for someone with management-side collective bargaining experience. This reason does not conflict with the Board's justification at the time. Further, unlike the Board's alleged preference for prior Superintendent experience, there is no evidence to show the Board interviewed candidates with no management-side collective bargaining experience. Instead, to show pretext, Goodsite points to the cause of her lack of experience in this area and the necessity of this experience, or lack thereof, required to perform the job of Superintendent.

Goodsite first alleges that the reason she lacked management-side experience was because she was denied the opportunity to gain this experience while serving Norwalk schools. Specifically, Goodsite testified that, though she was told she would be participating in the 2014-2015 collective bargaining negotiations, she was later told there was not "a seat at the table for [her]." (Doc. No. 49-1 at 173; Doc. No. 57-13 at 9). Without evidence that the Board itself denied Goodsite this experience, this, on its own, is not sufficient to show pretext. But this fact does not stand alone.

In addition to the cause of her lack of experience in this area, Goodsite testified that, throughout her tenure at Norwalk schools, "District management customarily retain[ed] a lawyer to represent the District in negotiations and the lawyer perform[ed] the work and direct[ed] the negotiation process on behalf of management." (Doc. No. 57-13 at 8). Goodsite knew this based on her considerable labor-side collective bargaining experience at Norwalk. (Doc. No. 57-13 at 8). The 2014-2015 collective bargaining negotiations were no different even though the Superintendent had a law degree. (Doc. No. 48-2 at 132; Doc. No. 57-13 at 8-9). From this a reasonable jury could

conclude management-side experience was not a sufficient reason to deny Goodsite the opportunity to even interview for the position.

In sum, I conclude there is sufficient evidence from which a reasonable jury could conclude the Board's reasons for not interviewing Goodsite were pretext for discrimination. Because a genuine dispute of material fact remains as to Goodsite's 2015 sex discrimination and retaliation claims, the Board is denied summary judgment of these claims.

## C.    Nonrenewal of Contract

Finally, Goodsite alleges the decision not to renew her contract for the 2015-2016 school year was an act of sex and age discrimination and retaliation. The Board contends that, because Goodsite did not file her EEOC Charge of Discrimination within 180 days of this allegedly unlawful employment practice, her claim must be dismissed. (Doc. No. 47 at 29; Doc. No. 63 at 50-51).

It is true that both the ADEA and Title VII require a charge to be filed with the EEOC within 180 days of the alleged unlawful employment action. See 29 U.S.C. § 626(d)(1)(A); 42 U.S.C. § 2000e-5(e)(1). But, as recently held by the Supreme Court in a Title VII case, the EEOC charge-filing requirement is nonjurisdictional. *Fort Bend Cnty, Tex. v. Davis*, 139 S. Ct. 1843, 1851-52 (2019). Instead, it is a mandatory processing rule that may be used by the employer as a "potentially dispositive defense." *Id.*

Here, in its answer to the amended complaint, the Board raised the defense that Goodsite's claims were "barred by the…time requirements for filing an administrative charge." (Doc. No. 19 at 13). But the Board then chose to "forego filing a motion for judgment on the pleadings in this matter," (Doc. No. 69-1 at 1), and instead pursued extensive discovery on all claims, including those related to the nonrenewal of contract. Because the Board failed to promptly pursue this "potentially dispositive" timely-charge-filing defense and because discovery and briefing has been completed as to these claims, I reject the Board's argument and instead consider the merits of these claims.

1.     **Age and Sex Discrimination *Prima Facie* Showing**

To prove a *prima facie* case of sex discrimination under Title VII or age discrimination under the ADEA, Goodsite must demonstrate:

> (1) she is a member of a protected group, (2) she was subject to an adverse employment decision, (3) she was qualified for the position, and (4) she was replaced by a person outside of the protected class ... [or] treated differently than similarly situated non-protected employees.

*Hopkins v. Canton City Bd. of Educ.*, 477 F. App'x 349, 354 (6th Cir. 2012) (quoting *Russell*, 537 F.3d at 604) (Title VII); *see also Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521-22 (6th Cir. 2008) (ADEA).[5]

There is no dispute that then-57-year-old Goodsite was a member of both the Title VII and ADEA protected classes. The remaining three elements are disputed

i.     **Adverse Employment Decision**

In its motion for summary judgment, the Board contends no adverse employment action occurred here because Goodsite's employment contract expired at the end of the 2014-2015 school year and because Goodsite expressed that she would not return after its expiration. (Doc. No. 47 at 24). But "nonrenewal of contract" is considered as an "adverse employment decision." *See Harris v. Butler Cnty., Ohio ex rel. its Sheriff's Dep't*, 344 F. App'x 195, 199 (6th Cir. 2009) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999)). Apparently recognizing this, in its reply the Board argues only that Goodsite "resigned." (Doc. No. 63 at 40-41).

But, contrary to the Board's allegation, Goodsite did not merely announce her decision not to return after her contract expired. Rather, Goodsite expressed her desire to remain Norwalk Assistant Superintendent many times to some if not all the Board members. (Doc. No. 49-1 at 174-

---

[5] For purposes of the ADEA, the fourth prong does not require that the plaintiff be replaced by someone under the age of 40, but instead merely someone "substantially younger." *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996).

78, 179-81).  Even Lendrum admitted "[s]he made it known [at] numerous points in time[.]"  (Doc. No. 49-3 at 287-88).

While contracts for the next school year were generally discussed in March, no one spoke to Goodsite about renewal.  (Doc. No. 49-1 at 184-85, 245-46).  Hearing nothing, on June 28, 2015, Goodsite sent her "Retirement Letter," which reads in part:

> To date, June 26, 2015, no one has spoken with me about the potential of coming back next year to work full-time, part-time or during a transition period as the assistant superintendent for a new superintendent.  Thus it is my assumption that I will not be returning to the district as I am on a one-year retire-rehire contract.  I have proceeded until the last couple of weeks with the thought that I may be returning or at least work with and mentor a new person.  However, I now feel the latter will not be the case as school is out for staff/students/most admin, the interim superintendent is gone, the new superintendent is beginning work on extended days, and no one has spoken to me about another contract or additional days for transition purposes.

(Doc. No. 49-2 at 118) (emphasis in original).  A few days after this letter was sent, Goodsite emailed Fisk again, stating her qualifications and expressing her interest "in consulting and/or part-time employment opportunities."  (*Id.* at 121).

From this evidence, a reasonable jury could conclude that Goodsite did not resign in this "Retirement Letter" but merely explained her assumption that the decision had already been made not to renew her contract.  Therefore, a genuine dispute of material fact remains as to whether Goodsite was subject to an adverse employment action.

### ii.      Qualification for Director of Operations Position

The Board next alleges Goodsite was not qualified for the position of Director of Operations.  To support its argument, the Board cites multiple functions which Goodsite had not performed.[6]  (Doc. No. 47 at 25).  First, there is no evidence that Ream, a former middle school principal, had experience performing these district-wide tasks.

---

[6] The Board also alleges Goodsite was not qualified because she "notified Fisk, on July 2, 2015, that she was only interested in consulting work or part-time employment."  (Doc. No. 47 at 26).  But the record evidence suggests it was Goodsite's desire to have her contract renewed for full-time

But, more importantly, the Board confuses experience performing specific tasks with qualifications for the position. The minimum qualifications for the position of Director of Operations are as follows:

1. Ohio Superintendent, Asst. Superintendent, Building Administrator, or comparable license as determined by the Board of Education
2. Possession of OTES credential
3. Meets all mandated health screening requirements
4. FBI/BCI Background Check
5. Adheres to the Licensure Code of Professional Conduct for Ohio Educators.
6. Complies with drug-free workplace rules, board policies and administrative guidelines/procedures.
7. Ability to establish positive working relationships with co-workers and function as part of a cohesive team.
8. Effective organizational planning and management skills.
9. Documented effectiveness in positions with supervisory requirements.
10. Prior successful experience as a building leader or comparable experience as determined by the Board of Education
11. Ability to monitor and manage compliance with health, safety, legislative, and environmental laws/regulations.
12. Willingness to accept working hours outside of the typical work day and uncertainty of required unscheduled work hours.

(Doc. No. 48-2 at 633).

Goodsite stated in her affidavit that she possessed these minimum qualifications and more. (Doc. No. 57-13 at 13). Linder corroborated her testimony. (Doc. No. 48-7 at 188). Because there is no evidence to refute her testimony, a genuine dispute of material fact remains as to whether Goodsite was qualified for the position of Director of Operations.

### iii.    Replaced by Substantially Younger Male

Finally, the Board argues Goodsite cannot satisfy the "replacement" element because the Assistant Superintendent position was dissolved when Goodsite's contract expired and the duties of that position were redistributed to other existing employees. (Doc. No. 47 at 24-25). In response, Goodsite alleges the Assistant Superintendent position was simply renamed "Director of

employment and only offered to perform part-time employment after it was not. Viewing the evidence in the light most favorable to Goodsite, I reject this argument.

Operations" and filled by Corey Ream, a 38-year-old man who was the Middle School Principal prior to taking the new job. (Doc. No. 57 at 54-55).

The Sixth Circuit has held "[a]n employer 'replaces' a discharged employee when it reassigns an existing employee to assume the discharged employee's duties in a way that 'fundamentally change[s] the nature of his employment.'" *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 537 (6th Cir. 2014) (quoting *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 522 (6th Cir. 1997)). "Spreading the former duties of a terminated employee among the remaining employees does not constitute replacement." *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992). Therefore, if Ream was "assigned to perform [Goodsite's] duties *in addition to* [his] other duties, or [if] the work [was] redistributed among other existing employees already performing related work[,]" Goodsite will not be considered "replaced." *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990) (emphasis added).

Here, ten of Goodsite's fifteen duties were assigned, at least in part, to Ream. (Doc. No. 47-8 at 2-3). Rather than performing these duties in addition to his existing duties, Ream resigned from his position as Middle School Principal and was replaced by Gary Swartz. (Doc. No. 47-7 at 191; Doc. No. 48-2 at 283, 296). As Director of Operations, Ream not only took on all new duties, most of which were those previously performed by the Assistant Superintendent, but also performed these duties from Goodsite's former office, which was still marked "Assistant Superintendent" in October 2017. (Doc. No. 48-10 at 39-40; Doc. No. 57-13 at 14, 23). Based on this evidence, a jury could reasonably conclude Goodsite was "replaced" by Ream, a substantially younger male.

## 2. ADEA and Title VII Retaliation *Prima Facie* Showing

Like the 2014 and 2015 retaliation claims, to satisfy her *prima facie* burden, Goodsite must show:

> (1) [she] engaged in a protected activity; (2) that the defendant had knowledge of [her] protected conduct; (3) that the defendant took an adverse employment action towards [her]; and (4) that there was a causal connection between the protected activity and the adverse employment action.

*Mickey*, 516 F.3d at 523 (quoting *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002)) (ADEA); *Russell*, 537 F.3d at 609 (Title VII). The fourth prong "requires proof of so-called 'but-for' causation, meaning that the plaintiff must furnish evidence that 'the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Mys*, 886 F.3d at 600 (quoting *Nassar*, 570 U.S. at 360).

Here, Goodsite engaged in Title VII protected activity by sending the 2008 Letter, as discussed above. Additionally, she also engaged in Title VII and ADEA protected activity by filing her EEOC Charge of Discrimination with the Ohio Civil Rights Commission on April 7, 2015, alleging age and sex discrimination as well as retaliation. (Doc. No. 49-2 at 131). In the charge, Goodsite addressed her 2008 complaint of sex discrimination, the 2014 failure to promote, and the 2015 failure to promote. (*Id.*). The Board knew of this Charge and defended against it. (Doc. No. 49-5 at 159-61, 163-85). Therefore, the first two elements are satisfied.

As for the third element, the Board again sets forth its theory of resignation. I again reject that theory and conclude the nonrenewal of her contract was an adverse employment action. Therefore, all that remains is the question of causation.

To begin, the Board yet again claims Goodsite's alleged resignation breaks any causal chain between Goodsite's protected activity and its decision not to renew her contract. (Doc. No. 47 at 42-43). Again, viewing the evidence in the light most favorable to Goodsite, I reject this argument.

The Board next argues there is no "but for" causation because four months passed between her EEOC Charge in April and the expiration of her contract in August. (Doc. No. 47 at 41-42; Doc. No. 63 at 43-45). But the temporal proximity between her EEOC Charge and the expiration of her contract is not relevant. Rather, what is relevant is when her contract could have been renewed. Goodsite alleges contracts for the following school year were generally discussed in March. (Doc. No. 49-1 at 91, 181, 246). Further, the Board meeting minutes suggest administrative contracts for the following year were approved anytime between December of the previous year and

August.  (Doc. No. 47-7 at 20, 33, 37, 43, 54, 69, 76, 83, 120, 133, 148, 162, 173, 182).  Because the evidence suggests contracts were approved on a rolling basis, the Board cannot rely on its four-month-temporal-proximity argument.

But, by Goodsite's own testimony, the evidence indicates that the decision not to renew her contract was made prior to the time she filed her EEOC Charge.  Specifically, Goodsite claims people stopped speaking to her about staying at Norwalk in the spring – March.  (Doc. No. 49-1 at 184-85).  In fact, Goodsite testified that no one spoke to her in March about her employment for the next school year as they normally would have.  (Doc. No. 49-1 at 245-46).  There is no evidence to suggest the Board intended to renew her contract before she filed her EEOC Charge in April but changed its mind after the filing.  Therefore, because the evidence suggests the decision was made before Goodsite filed the charge, a reasonable jury could not conclude her Title VII and ADEA protected activity was the "but-for" cause of the Board's decision not to renew her contract.

Because the EEOC charge was not the "but-for" cause of the Board's decision and Goodsite's 2008 activity was protected under only Title VII, not the ADEA, the Board is granted summary judgment of Goodsite's ADEA discrimination claim.  Goodsite's Title VII claim may survive if she can show it was the "but-for" cause of the Board's decision not to renew her contract.

Although Goodsite made it known that she would like to remain Assistant Superintendent, there is evidence that the Board never discussed it.  (Doc. No. 48-10 at 196-97).  Ritzenthaler explained that he did not discuss it with the other three members because "it wasn't going to fly," "there was always going to be a 3-2 vote against Sue." (*Id.*).  This evinces the remaining animus between Goodsite, Lendrum, and Ludwig, which began with her 2008 protected activity.

But the evidence shows that, historically, the Superintendent chose his or her own assistant.  (Doc. No. 48-2 at 230; Doc. No. 48-7 at 191; Doc. No. 48-10 at 127; Doc. No. 49-3 at 108; Doc. No. 49-6 at 133).  The Board merely formalized that choice.  In 2015, Fisk was the one to suggest the position of Director of Operations and proposed three candidates to fill that position –

Goodsite was not one of those candidates. (Doc. No. 47-8 at 1-3). Of the three, the Board chose Ream.

There is no evidence that the Board – and specifically Goodsite's 2008 letter – influenced Fisk's decision. Further, there is no evidence to suggest that "but for" Goodsite's 2008 letter, the Board would have independently renewed Goodsite's contract, deviating from the precedent of allowing the Superintendent to pick his own assistant. Because there is no evidence from which a reasonable jury could conclude Goodsite's 2008 protected conducted was the "but-for" cause of Goodsite's nonrenewal, the Board is also granted judgment on Goodsite's Title VII retaliation claim.

### 3.     Pretext of the Board's Reasons

Because Goodsite met her *prima facie* burden with respect to her ADEA and Title VII discrimination claims, the burden shifts to the Board to show this decision was not discriminatory. The Board alleges it decided not to renew Goodsite's contract because of Norwalk's policy of granting retire-rehire employees only one-year contracts and because Fisk decided to create the new position of Director of Operations after receiving Goodsite's "Retirement Letter." (Doc. No. 47 at 27-28).

Regarding the retire-rehire policy, there is evidence that Norwalk had granted male employees multi-year retire-rehire contracts. (Doc. No. 49-3 at 100-01; Doc. No. 57-13 at 10). Based on this evidence, a reasonable jury could conclude the Board's decision not to offer Goodsite the same was discriminatory. Thus, there is a dispute of fact as to whether this reason was a pretext for sex discrimination.

As for its second reason, there is evidence that, as opposed to many of the Board members, Fisk not did know of Goodsite's true desire to remain Superintendent when he received her "Retirement Letter" and formulated the Director of Operations position. (Doc. No. 47-8 at 1-5; Doc. No. 49-1 at 179). Further, the evidence suggests that, at Norwalk, the Superintendent was permitted to choose his or her own assistant. (Doc. No. 48-2 at 230; Doc. No. 48-7 at 191; Doc.

No. 48-10 at 127; Doc. No. 49-3 at 108; Doc. No. 49-6 at 133). On the Superintendent's recommendation, the Board would approve the Superintendent's choice.

This case was slightly different. Here, Fisk formulated the position of Director of Operations and proposed that Folger, Ream, or one of Norwalk's elementary schools, a 48-year-old man, fill that position. (Doc. No. 47-8 at 1-3). Because Ream's brother had served as one of Fisk's references for the Superintendent position, the Board chose Ream itself to avoid any inference of "favoritism." (Doc. No. 49-6 at 281). In any case, Goodsite was not one of Fisk's choices to serve as his assistant. The Board's decision was merely an endorsement of Fisk's proposal, an act which adhered to the district's historical precedent.

Norwalk could have done Goodsite the courtesy of keeping her informed of the status of her employment, especially in light of her years of dedicated service to the district. But there is insufficient evidence to suggest the decision not to renew Goodsite's contract was pretext for age or sex discrimination, even though the ultimate decision was to hire a 38-year-old man. Therefore, the Board is granted summary judgment on these claims.

### D.    Sex-Plus-Age and Age-Plus-Sex Claims

In the amended complaint Goodsite states an age-plus-sex under the ADEA and sex-plus-age claims under Title VII and Ohio law. (Doc. No. 1 at 9-11).

As discussed above, Title VII and the ADEA are similar, and the claims under them are similarly analyzed. But there is a notable difference between the two. While Title VII permits "mixed-motive" discrimination claims, the ADEA does not. *See Gross*, 557 U.S. at 174-76. That is, Title VII requires sex be only a "motivating factor" for the employer's allegedly illicit conduct. 42 U.S.C. § 2000e-2(m). But the ADEA requires "age [be] the 'but-for' cause of the challenged adverse employment action." *Gross*, 557 U.S. at 180.

Because the ADEA does not recognize "mixed-motive" claims, the Board is granted judgment as a matter of law on Goodsite's ADEA age-plus-sex claim, stated as Count Eight of the

Amended Complaint.  *Cf. Thompson v. City of Columbus*, No. 2:12-cv-01054, 2014 WL 1814069, at *10 (S.D. Ohio May 7, 2014) (collecting cases to show "age-plus claims under the ADEA do not exist").

Goodsite's sex-plus-age claims need not be rejected for the same reasons.  *See, e.g., Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971) (*per curiam*) (analyzing a sex-plus discrimination claim); *Derungs v. Wal-Mart Stores, Inc.*, 374 F.3d 428, 438 n.8 (6th Cir. 2004) (recognizing the existence of sex-plus claims in dicta).  But as noted by the Eastern District of Pennsylvania, "[t]he point behind the establishment of the sex-plus discrimination theory is to allow Title VII plaintiffs to survive summary judgment when the defendant employer does not discriminate against *all* members of the sex."  *Arnett v. Aspin*, 846 F. Supp. 1234, 1240 (E.D. Pa. 1994).  Here, as discussed above, Goodsite's claims do not require a finding that younger women were treated more favorably.  Instead, the facts supporting every claim show she was, or was not, treated less favorably than a male employee.  Therefore, the Board is granted judgment as a matter of law of any sex-plus-age claim.

## V.    CONCLUSION

For the foregoing reasons, the Board's motion for summary judgment is granted, in part, and denied, in part.  Specifically, the motion is granted as to Goodsite's 2014 age discrimination and retaliation claims, 2015 age retaliation claim, all nonrenewal of contract claims, and any age-plus-sex or sex-plus-age claim.  The motion is denied with respect to Goodsite's 2014 sex discrimination and retaliation claims, 2015 age discrimination claim, and 2015 sex discrimination and retaliation claims.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge